**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
In re                                                    :
                                                         :          Chapter 11
GATEWAY KENSINGTON LLC,                                  :
                                                         :          Case No. 21-22274 (RDD)
                                    Debtor.              :
--------------------------------------------------------x

## REPORT OF FRED STEVENS, EXAMINER

**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Fred Stevens
Kathleen M. Aiello

Dated:  New York, New York
        January 25, 2022

# TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ................................................................................ 1

   A.   Scope of the Investigation, In Brief. .................................................... 1

   B.   What Is Kensington? ............................................................................ 3

   C.   Why is Kensington in Bankruptcy and What is its Bankruptcy Case About? ...... 4

   D.   Note Regarding the Interpersonal Disputes and Neutrality of Examiner ............. 5

   E.   Summary of Examiner's Conclusions ................................................... 6

II.  KEY ENTITIES AND INDIVIDUALS ....................................................... 9

   A.   John J. Fareri ........................................................................................ 9

   B.   James Carnicelli, Jr. ............................................................................. 9

   C.   Gateway Kensington LLC .................................................................. 10

   D.   The Gateway Development Group, Inc ............................................... 11

   E.   Other Involved Individuals and Entities ............................................. 12

III. RELEVANT CASE BACKGROUND ...................................................... 13

   A.   The Project .......................................................................................... 13

   B.   Overview of Brownfield Tax Credits ................................................. 14

   C.   The Falling Out Between Messrs. Fareri and Carnicelli ..................... 16

   D.   The Arbitration ................................................................................... 21

     i.   The Dueling Contracts ................................................................. 21

  ii.  The Relevant Timeline ................................................................... 23

  iii. The Arbitrators' Decision and Points of Interest............................. 25

 E.  Kensington's Bankruptcy Case and Appointment of the Examiner ................. 26

 F.  The Transfers at Issue to the Investigation and this Report ............................... 27

 G.  The Insider Claims at Issue ..................................................................... 28

 H.  The Examiner's Work Plan for the Investigation................................................ 28

 I.  The Methods Employed to Conduct the Investigation........................................ 29

IV. DOES KENSINGTON'S BANKRUPTCY ESTATE HAVE ANY VALID ESTATE

  CLAIMS TO ASSERT? ............................................................................. 31

 A.  Summary of Potential Claims Outlined by Carnicelli........................................ 31

 B.  Legal Theories of Recovery Considered in the Investigation ............................ 31

  i.  Avoidance of Fraudulent Transfers ................................................... 32

  ii.  Recovery of Preferential Transfers.................................................... 39

  iii. Damages in Connection with Breach of Fiduciary Duties ............................. 40

 C.  Analysis of Claims for Avoidance of Fraudulent Transfers ............................... 43

  i.  Gating Issue #1 – Three-Year Lookback Imposed by NYLLCL § 508(c)...... 43

  ii.  Gating Issue #2 – When did Kensington Become Insolvent, or Have

    Unreasonably Small Capital?........................................................... 50

  iii. Gating Issue #3 – Are BTCs Transfers by Kensington That Can be Recovered?

    .................................................................................................. 57

iv.    Gating Issue #4 – Is Mr. Fareri Entitled to Any Credit for Capital Contributions Made to Kensington After Receipt of Otherwise Improper Distributions? .... 73

v.    Are Any Claims for Avoidance of Fraudulent Transfers Likely to be Meritorious? ................................................................................... 79

D.    Analysis of Claim for Recovery of Preferential Transfers .................................. 82

E.    Analysis of Claim for Breach of Fiduciary Duties ............................................. 83

V. ANALYSIS OF INSIDER CLAIMS ........................................................................... 86

A.    Concept – Recharacterization of Claims to Equity ............................................. 87

B.    Factual Analysis of Each Insider Claim .............................................................. 88

i.    500WPA Claim ................................................................................................. 88

ii.    Mr. Carnicelli Claim ........................................................................................ 89

iii.    Development Claim .......................................................................................... 90

iv.    GPSC Claim ..................................................................................................... 90

v.    Wescorp Claim ................................................................................................. 91

C.    Recharacterization of the Insider Claims ............................................................ 93

VI. INVESTIGATIVE CONCLUSIONS ........................................................................ 94

# TABLE OF AUTHORITIES

Cases:

Allen Morris Commercial Real Estate Srvcs. Co. v. Numismatic Collectors Guild, Inc.,
1993 WL 183771 (S.D.N.Y. May 27, 1993) .....................................................................74, 75

Am. Federated Title Corp. v. GFI Mgmt. Servs. Inc., NO. 13-6437,
2016 WL 4290525 (S.D.N.Y. Aug. 11, 2016) ........................................................................77

Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240 (2d Cir. 1987) ........................74, 75, 76

Auerbach v. Bennett, 47 N.Y.2d 619, 419 N.Y.S.2d 920 (1979) ...............................................41

Beth Israel Med. Ctr. V. Horizon Blue Cross & Blue Shield of New Jersey, Inc.,
448 F. 3d 573 (2d. Cir. 2006) ....................................................................................................71

Butner v. United States, 440 U.S. 48 (1979) ..............................................................................60

Cassirer v. Herskowitz (In re Schick), 234 B.R. 337 (Bankr. S.D.N.Y. 1999) ...........................40

Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc. (In re Croton River Club, Inc),
52 F.3d 41 (2d Cir. 1995) ..........................................................................................................41

Empire Gen Holdings, Inc. v. Governor of State,
40 Misc. 3d 984, 989, 967 N.Y.S.2d 919, 923 (Sup. Ct. 2013) ...............................................64

Enron v. UBS AG and UBS Sec., LLC (In re Enron),
Bankruptcy No. 01 B 16034(AJG), Adversary No 03-93373 A.
2005 WL 3873897 (Bankr. S.D.N.Y. Aug. 10, 2005) .............................................................36

Farm Stores, Inc. v. School Feeding Corp., 477 N.Y.S.2d 374 ...........................................74, 76

Fed. Ins. Co. v. Mertz, 12-cv-1597-NSR-JCM,
2016 WL 164618 (S.D.N.Y. Jan. 12, 2016) .............................................................................42

Friedman v. Wahrsager, 848 F. Supp. 2d 278 (E.D.N.Y. 2012) ................................................40

Geron v. Craig, et al. (In re Direct Access Partners, LLC),
602 B.R. 495 (Bankr. S.D.N.Y. 2019) .......................................................43, 45, 48, 75, 76, 77

Ginsburg v.  United States, 136 Fed. Cl. 1 (2018) ....................................................................58

Gowan v. The Patriot Group, LLC (In re Dreier LLP),
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ................................................................................33, 36

Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.),
      310 B.R. 500 (Bankr. S.D.N.Y. 2002) ...................................................................36

Guinn v. Lines (In re Trans-Lines West, Inc.), 203 B.R. 653 ...........................................61, 64, 68

HBE Leasing Corp. v. Frank, 48 F.3d 623 (2d Cir. 1995) ................................................34, 74, 75

Hirsch v. Gersten (In re Centennial Textiles), 220 B.R. 165 (Bankr. S.D.N.Y. 1998) ...............75

Hoecker v. United Bank of Boulder, 476 F.2d 838 (10th Cir. 1973) ............................................32

Holliday v. Credit Suisse Sec. (USA) LLC,
      No. 20 CIV. 5404 (GBD), 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021) ............................48

In re Actrade Fin. Techs. Ltd., 337 B.R. 791......................................................................34

In re Adelphia Comm'ns Corp., Bankr. No. 02-41729,
      2006 WL 687153, at 9-10 (Bankr. S.D.N.Y. March 6, 2006) ..................................87

In re AutoStyle Plastics, Inc., 269 F.3d 726 (6th Cir. 2001) ............................................87, 88, 93

In re Bob Richards Chrysler-Plymouth Corp., Inc., 473 F.2d 262 (9th Cir. 1973) ....................60

In re Boston Generating LLC, 617 B.R. 442 (Bankr. S.D.N.Y. 2020) ..................................48, 49

In re Cassandra Group, 338 B.R. 583 (Bankr. S.D.N.Y. 2006) ....................................................35

In re Crysen/Montenay Energy Co., 902 F.2d 1098 (2d Cir. 1990) ...........................................60

In re Freudmann, 495 F. 2d 816 (2d Cir. 1974) ..........................................................................36

In re Howard's Appliance Corp., 874 F.2d 88 (2d Cir. 1989) .....................................................60

In re Iridium Operating LLC, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) ........................................56

In re L.J. O'Neill Shoe Co., 64 F.3d 1146 (8th Cir. 1995) ...........................................................62

In re Live Primary, LLC, 626 B.R. 171 (Bankr. S.D.N.Y. 2021) ................................................87

In re Lyman Commerce Solutions, Inc. v. Lung,
      No. 12 CIV. 4398 TPG, 2015 WL 1808693 (S.D.N.Y. Apr. 20, 2015) ....................47, 48, 49

In re Lyondell Chemical Co., 567 B.R. 55 (Bankr. S.D.N.Y. 2017) ...........................................51

In re Majestic Star Casino, LLC, 716 F. 3d 736 (3d Cir. 2013) .......................................64, 65, 68

In re Marciano, 372 B.R. 211 (Bankr. S.D.N.Y. 2007) ....................................................61

In re Marine Risks, Inc., 441 B.R. 181 (Bankr. E.D.N.Y. 2010) ..................................42

In re Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056 (3d Cir. 1992) ................51

In re Prudential Lines Inc., 928 F.2d 565 (2d Cir. 1991) ...........................................59, 60, 61, 68

In re S.Side House, LLC, 474 B.R. 391 (Bankr. E.D.N.Y. 2012) ................................60

In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005) ........................................................36, 74, 84

In re SubMicron Systems, Corp., 432 F3d 448 (3d Cir. 2006) ....................................87

In re STN Enter., 779 F.2d 901 (2d Cir. 1985) ..........................................................6, 32, 95

In re Trickett, 391 B.R. 657 (Bankr. D. Mass. 2008) ..................................................61

Jalbert v. Flom, et al. (In re BICOM NY, LLC),
       633 B.R. 25 (Bankr. S.D.N.Y. 2021) ..............................................................74

Kelly v. Blum, Civil Action No. 4516-VCP,
       2010 WL 629850 (Del. Ch. Feb. 24, 2010) ...................................................41

Kipp v. Depoy (In re Depoy), 29 B.R. 466 (Bankr. N.D.Ind. 1983) ...........................60

Kokoszka v. Belford, 417 U.S. 642 (1974) ...................................................................61

Lighthouse Pointe Prop. Assocs. LLC v. N.Y. State Dep't of Envtl. Conserv.,
       14 N.Y.3d 161 (2010) ....................................................................................15

Lippes v. Bairnco Corp., 249 F. Supp. 2d 357 (S.D.N.Y. 2003) ................................38

MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Svcs. Co.,
       910 F.Supp. 913 (Bankr. S.D.N.Y. 1995) ......................................................56

Minstart Acquiring Corp. v. AMF Inc., 621 F. Supp. 1252 (S.D.N.Y. 1985) ..............42

Musso v. Herman (In re Tesmetges), 85 BR 683 (Bankr. E.D.N.Y. 1988) ................38

Musso v. Ostashko, 468 F.3d 99 (2d Cir. 2006) ...........................................................61

Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255 (2d Cir. 1984) ....................40, 41, 42

Novara ex rel. Jones v. Cantor Fitzgerald, LP,
       20 A.D. 3d 103, 795 N.Y.S.2d 133 (3d Dept. 2005) .....................................64

O'Connell v. Shallo (In re Die Fliedermaus LLC),
    323 B.R. 101 (Bankr. S.D.N.Y. 2005) ...............................................43, 44, 45, 46, 47, 48, 49

Official Committee of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.), 524 B.R. 536 (Bankr. S.D.N.Y. 2015) ......................................................................38, 43

Pashaian v. Eccelston Props., 88 F.3d 77 (2d Cir. 1996) ...........................................................74

Patrick v. Allen, 355 F. Supp. 2d 704 (S.D.N.Y. 2005) ..............................................................41

Pereira v. Checkmate Cmmc'ns Co., Inc. (In re Checkmate Stereo and Elecs., Ltd.),
    9 B.R. 585 (Bankr. E.D.N.Y. 1981) .................................................................................36, 75

Remo Drug Corp. v. Sheik, No. CV-89-0508,
    1990 WL 82820 (E.D.N.Y. June 12, 1990) ......................................................................74, 76

Rodriguez v. Fed. Deposit Ins. Corp., 140 S. Ct. 713, 206 L. Ed. 2d 62 (2020) .........................60

Roy Export Co. Establishment of Vaduz v. CBS, Inc.,
    672 F.2d 1095 (2d Cir. 1982), cert. denied, 459 U.S. 826 (1982) .........................................42

RSL Communs. PLC v. Bildirici, Case No. 04-cv-5217,
    2006 WL 2689869 (S.D.N.Y. 2006) ......................................................................................40

Sardis v. Frankel, 113 A.D.3d 135, 143, 978 N.Y.S.2d 135, 142 (1st Dep't 2014) ....................39

Savage & Assocs., P.C. v. Mandi (In re Teligent, Inc.),
    380 B.R. 324 (Bankr. S.D.N.Y. 2008) ...................................................................................33

Setters v. AI Properties & Devs. (USA) Corp.,
    139 A.D.3d 492, 32 N.Y.S.3d 87 (1st Dept. 2016) ..........................................................48, 49

Silverman v. Sound Around, Inc., 404 B.R. 710 (Bankr. E.D.N.Y. 2009) ....................................39

Signature Apparel Grp. v. Laurita, Case. No. 09-15378 (RG), Adversary No. 11-02800 (RG),
    2015 WL 1009452 (Bankr. S.D.N.Y. March 4, 2015) ............................................................40

Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429 (S.D.N.Y. 2006) ..............................................40

Soley v. Wasserman, 823 F. Supp. 2d 221 (S.D.N.Y. 2011) ..................................................41, 42

Southern Industries, Inc. v. Jeremias,
    66 A.D.2d 178, 411 N.Y.S.2d 945, 948-9 (2d Dep't 1978), 411 N.Y.S.2d at 948-49 ...........75

Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.),
    435 B.R. 866 (Bankr. S.D.N.Y. 2010) ...................................................................................37

Treadway Cos., Inc. v. Care Corp., 638 F.2d 357(2d Cir. 1980) ...................................41

Tronox Inc. v. Kerr McGee Corp. (In Re Tronox Inc.),
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ...................................................50

United States v. Whiting Pools, Inc., 462 U.S. 198 (1983) ...................................59, 60

Warth v. Seldin, 422 U.S. 490, 95 S. Ct. 2197 (1975) ....................................59

Webster v. Mooney (In re Mooney), 526 B.R. 421 (Bankr. M.D. Ga. 2015) ...............................61

Williamson v. Culbro Corp. Pension Fund,
    41 A.D.3d 229, 838 N.Y.S. 2d 524 (1st Dept. 2007) .........................................46, 48

Zurich Ins. Co. v Shearson Lehman Hutton, Inc.,
    84 N.Y.2d 309, 618 N.Y.S.2d 609 (1994) ...................................................42

## *Other Authorities:*

11 U.S.C. § 101(31) ...................................................................40

11 U.S.C. § 101(32) ...................................................................50

11 U.S.C. § 346(c) ....................................................................62

11 U.S.C. § 541(a) ....................................................................59

11 U.S.C. § 541(a)(1).................................................................59

11 U.S.C. § 541(d) ....................................................................60

11 U.S.C. § 544(b).............................................................45, 46, 48, 49

11 U.S.C. § 547(b)...............................................................39, 40

11 U.S.C. § 547(b)(5)..................................................................83

11 U.S.C. § 548(c) ....................................................................74

11 U.S.C. § 548(a)(1)(A) .......................................................33, 34, 36

11 U.S.C. § 548(a)(1)(B) ..........................................................37, 38

11 U.S.C. § 1104......................................................................32

11 U.S.C. § 1107 ..................................................................................32

18 U.S.C. § 1344 ..................................................................................85

26 U.S.C. § 1399 ..................................................................................62

26 U.S.C.A. § 701 .................................................................................62

NY Debtor & Creditor Law, Article 10 .................................................33

NY Debtor & Creditor Law § 272 ....................................39, 74, 75, 76

NY Debtor & Creditor Law § 273 ......................................... 37, 38, 76

NY Debtor & Creditor Law § 275 .................................................37, 38

NY Debtor & Creditor Law § 276 .............................................34, 35, 36

New York Lien Law, Article 3-A ...........................................................85

New York Limited Liability Company Law 409 ...................................40

New York Limited Liability Company Law 508(c) ...................43, 44, 45, 46, 47, 48, 54, 73, 80

New York Tax Law § 21(a)(2)-(3) .........................................................15

New York Tax Law § 21(a)(6) ...............................................................15

New York Tax Law § 21(b)(1) ...............................................................15

New York Uniform Voidable Transactions Act § 4(a)(1).......................34, 35

New York Uniform Voidable Transactions Act § 4(a)(2).......................37

New York Uniform Voidable Transactions Act § 4(b) ...........................34

New York Uniform Voidable Transactions Act § 4(b)(2).......................38

New York Uniform Voidable Transactions Act § 5(a)............................37

New York Uniform Voidable Transactions Act § 5(b) ...........................37

# TABLE OF EXHIBITS TO REPORT

NOTE:  Unless otherwise stated, all references to "Exhibits" in this Report refer to exhibits set forth in the *Compendium of Exhibits to Report of Fred Stevens, Examiner*, a hardcopy of which is being provided by the Examiner to the Court, and counsel to the United States Trustee, James Carnicelli, Jr., the Debtor, John J. Fareri, the Development Trustee and Sterling.  The Examiner references but does NOT include as exhibits any documents that can be found on the Bankruptcy Court's official and public docket of this bankruptcy proceeding or registry of claims.

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Examiner's Calculation of the Estimated Estate Shortfall |
| B | List of Fareri Companies Provided by Debtor Gateway Kensington LLC |
| C | Operating Agreement for the Debtor Gateway Kensington LLC |
| D | Shareholder Agreement for The Gateway Development Group, Inc. |
| E | Schedule of Condominium Unit Closing Prepared by Kensington |
| F | Examiner's Independent Analysis of Kensington Condominium Sales |
| G | Report of Examiner's Special Tax and Environmental Counsel, Mintzer Mauch |
| H | Contract between Gateway Kensington LLC and The Gateway Development Group, Inc. dated as of May 5, 2014 |
| I | Gateway Kensington LLC's Original IT-611.1 for 2016 Site Preparation Brownfield Tax Credit |
| J | Gateway Kensington LLC Original IT-611.1 for 2017 Tangible Property Brownfield Tax Credit |
| K | Amended IT-611 for 2017 Tangible Property Brownfield Tax credit |
| L | Gateway Kensington LLC's Internal Accounting of Inflows and Outflows of Capital to its Owners and Affiliates |
| M | Examiner's Independent Analysis of Transfers to Insiders |
| N | January 28, 2017 Email from Joseph Moukattaf to James Carnicelli |
| O | Examiner's Analysis of Gateway Kensington LLC's Solvency and Financial Condition |
| P | Examiner's Analysis of Year-End Capital Accounts for Members of Gateway Kensington LLC |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Q | Kensington's Requested Adjustments to Examiner's Identification of Capital Contributions From and Distributions to Mr. Fareri During the Three-Year Period Prior to the Petition Date |
| R | Examiner's Analysis of Kensington's Requested Adjustments to Three-Year Transfer Schedule |
| S | Kensington's Working Capital Analysis for September 2017 to August 2018 |
| T | Kensington's December 20, 2017 Projections of Cash Flow in Connection With Twelve Units Given to Sterling as Collateral for Mortgage |

# TABLE OF DEFINED TERMS USED IN REPORT

| TERM | DEFINITION |
|---|---|
| 500WPA | 500 WPA LLC |
| 500WPA Claim | General unsecured claim of 500WPA scheduled by Kensington in the amount of $600,000 |
| 2016 BTC Request | Kensington's request for a BTC for site preparation and remediation work completed in 2016 |
| 2017 BTC Request | Kensington's request for a BTC for a tangible property credit for qualified expenditures made in 2017 |
| April 2018 Restructuring | The restructuring of Kensington's secured construction loan with Sterling and modification of that loan to a mortgage loan in or around April 23, 2018 |
| Arbitration | Matter of *James Carnicelli, Jr. derivatively on behalf of The Gateway Development Group, Inc. v. Gateway Kensington, LLC*, AAA Case No. 01-19-0004-4927 |
| Arbitration Award | Award issued by the arbitrators in the Arbitration dated on or around April 25, 2021 in favor of Development and against Kensington in the total combined amount of $14,333,446.38 |
| Article 3A | Article 3-A of the New York Lien Law |
| Bankruptcy Code | Title 11 of the United States Code |
| BCP | New York State Brownfield Cleanup Program |
| BCA | A Brownfield Cleanup Agreement between a participant in the BCP and the NYS DEC |
| BTC | Tax credit granted by New York State under the BCP |
| BTC Requests | Collectively, the 2016 BTC Request, the 2017 BTC Request and any other BTC requests that may be made by Kensington, Mr. Fareri or any others on account of the Project |
| Carnicelli (Mr.) | James Carnicelli, Jr. |
| COC | Certificate of Completion of the site remediation work at the project issued to Kensington by the NYS DEC on December 28, 2016 |
| Contract 1 | Contract between Kensington and Development dated December 7, 2015 providing for Development's management of the Project |
| Contract 2 | Contract between Kensington and Development dated as of May 5, 2014 but signed March 9, 2018 providing for Development's management of the Project |
| Court | United States Bankruptcy Court for the Southern District of New York |

| TERM | DEFINITION |
|---|---|
| Debtor | Gateway Kensington LLC (also defined as "Kensington" below) |
| Development | The Gateway Development Group, Inc. |
| Development Claim | Claim No. 3 filed by the Development Trustee against the Estate on account of the Arbitration Award |
| Development Shareholder Agreement | Agreement between Mr. Fareri, Mr. Carnicelli and Development dated as of January 1, 2014 regarding Development's governance |
| Development Trustee | Howard Magaliff, as permanent Chapter 7 bankruptcy trustee of Development's bankruptcy estate |
| Draft Report | The draft of this Report circulated to the parties on January 17, 2022 |
| Estate | Kensington's bankruptcy estate |
| Estate Claims | Claims that may be asserted by a trustee or other representative of Kensington's Estate that are one of the principal subjects of the Report |
| Estate Shortfall | Amount necessary after liquidation of Kensington's assets to ensure payment of Kensington's creditors in full |
| Examination Order | Court's order dated September 27, 2021 directing the appointment of an examiner |
| Examiner | Fred Stevens, the examiner appointed by the UST pursuant to the Examination Order |
| Fareri (Mr.) | John J. Fareri |
| Fareri Company/Companies | Entities owned and/or controlled by Mr. Fareri |
| Fareri Associates | Fareri Associates, L.P. |
| GPSC | Greenwich Premier Services Company |
| GPSC Claim | General unsecured claim of GPSC scheduled by Kensington in the amount of $1,088,927.10 |
| GPSC Transfer | $432,713.80 paid to GPSC by Kensington on August 17, 2020 |
| Insider Claims | Claims scheduled by Kensington or asserted against Kensington's Estate by insiders or related individuals or entities |
| Investigation | Examiner's charge under the Examiner Order |
| Kensington | Debtor Gateway Kensington LLC (also defined as "Kensington" above) |
| KWJS&S | Klestadt Winters Jureller Southard & Stevens, LLP, Examiner's general counsel |

| TERM | DEFINITION |
|---|---|
| Mintzer Mauch | Mintzer Mauch PLLC, Examiner's special counsel in connection with analysis of the BTCs |
| MM Report | Report prepared for the Examiner by Mintzer Mauch |
| NYDCL | New York State Debtor and Creditor Law |
| NYECL | New York State Environmental Conservation Law |
| NYLLCL | New York State Limited Liability Company Law |
| NYTL | New York State Tax Law |
| NYUVTA | New York State Uniform Voidable Transactions Act |
| NYS DEC | New York State Department of Environmental Conservation |
| NYS TAX | New York State Department of Taxation and Finance |
| Petition Date | May 14, 2021 |
| Project | Kensington's acquisition, remediation and condominium development project at 15 Kensington Road, Bronxville, New York 10708 |
| Report | Report of the Examiner issued pursuant to the Examiner Order |
| Sheskier (Mr.) | Christopher Sheskier |
| Sterling | Sterling National Bank |
| Sterling Escrow | Escrow fund with proceeds from the sale of certain condominium units at the Project established by Sterling in connection with its original construction loan to Kensington |
| UST | William K. Harrington, United States Trustee for Region 2, who is represented in this case by Trial Attorney Brian Masumoto |
| Wescorp Claim | General unsecured claim of Wescorp scheduled by Kensington in the amount of $33,499.14 |
| Wescorp Transfers | $39,770.42 paid to Wescorp by Kensington from June 26, 2020 to September 9, 2020 |

# I. EXECUTIVE SUMMARY

## A. Scope of the Investigation, In Brief.

On September 27, 2021, the United States Bankruptcy Court for the Southern District of New York (this "Court") entered an order (the "Examination Order") directing the appointment of an examiner in the Chapter 11 case of Gateway Kensington LLC ("Kensington" or the "Debtor") [Docket No. 69].  On October 4, 2021, William K. Harrington, United States Trustee for Region 2 (the "UST") filed his notice of appointment of Fred Stevens, as examiner (the "Examiner"), and his motion seeking the approval of such appointment [Docket Nos. 77 and 78].  Also on October 4, 2021, the Court entered an order approving the UST's appointment of the Examiner [Docket No. 79].

In the Examination Order, the Court enumerated the duties of the Examiner which included, among other things, an investigation (a) to determine any claims of the Debtor's estate against insiders or affiliates (each an "Estate Claim, collectively, "Estate Claims"), (b) to determine the extent, validity and priority of any claims scheduled or asserted by insiders or affiliates (each an "Insider Claim," or collectively "Insider Claims")[1], and (c) of the application for and use of tax credits under the New York State Brownfield Clean Up Program (a "BTC") by the Debtor's owner and principal, John J. Fareri (collectively, the "Investigation").  The Examiner Order further required the Examiner to file a report of his Investigation (this "Report") by no later than January 25, 2022, unless such deadline is extended by the Court.

---

[1] The use of the term "Insider" with respect to this defined term is not intended to constitute an opinion by the Examiner regarding the status of parties as statutory or other insiders of Kensington unless otherwise stated in this Report.  For example, the claim asserted by James Carnicelli Jr. against Kensington is examined as an "Insider Claim," while Mr. Carnicelli is clearly not a statutory insider of Kensington.

To assist him in his Investigation and preparation of this Report, the Examiner retained Klestadt Winters Jureller Southard & Stevens, LLP ("KWJS&S") as his general counsel, and Mintzer Mauch PLLC ("Mintzer Mauch") as his special counsel in connection with certain tax and environmental matters, subject to the approval of this Court.[2]

To conduct his Investigation, the Examiner obtained documents from the Debtor, John J. Fareri ("Mr. Fareri"), James Carnicelli, Jr. ("Mr. Carnicelli"), and Sterling National Bank ("Sterling"). The Examiner and his counsel conducted examinations under oath of, had conversations with, and/or held meetings or interviews with, the case constituents including (i) the Debtor (examined under oath through Mr. Fareri), (ii) Mr. Fareri (examined under oath), (iii) Mr. Carnicelli, (iv) Howard Magaliff (the "Development Trustee"), Chapter 7 trustee of the Debtor's most significant creditor, The Gateway Development Group, Inc. ("Development"), (v) Christopher Sheskier ("Mr. Sheskier") (examined under oath), who effectively served as the Chief Financial Officer or controller for the Debtor and various other entities owned by Fareri,[3] (vi) counsel to Sterling; and (vii) the parties' professional teams. The Examiner received and reviewed approximately 3,500 pages of documents in the course of his Investigation. In general, the Examiner found the Debtor, Mr. Fareri, Mr. Carnicelli, Mr. Sheskier and other interviewees and examinees responsive to the Examiner's information requests, willing to provide/volunteer information and, during any meetings, interviews or examinations, answer questions largely

---

[2] On November 5, 2021, this Court entered an order authorizing the Examiner's retention of KWJS&S [Docket No. 93], and on January 18, 2022, this Court entered an order authorizing the Examiner's retention of Mintzer Mauch [Docket No. 105].

[3] When examined, Mr. Sheskier claimed to be the Chief Financial Officer for Mr. Fareri and certain businesses owned predominately by Mr. Fareri, but not to have been elected to that position by Kensington or Development. However, the Examiner has reviewed a number of documents transmitted to the State of New York where Mr. Sheskier was designated as the Chief Financial Officer of Kensington, and has concluded based upon the examination that even if Mr. Sheskier did not have the official title, he clearly functioned in that capacity for Kensington.

without interruption by counsel.[4]  In sum, even though the investigation was conducted in a short time frame, the Examiner believes that he was able to conduct a sufficient Investigation[5] to fulfill his charge under the Examination Order.

### B.  What Is Kensington?

Kensington is a limited liability company formed by Mr. Fareri, its managing member and majority owner[6], under the laws of the State of New York on or around December 12, 2013. Kensington was formed for the purpose of acquiring, remediating, and developing into condominiums certain land located at 15 Kensington Road, Bronxville, New York 10708 (the "Project").  The Project was financed through a combination of direct or indirect contributions of money and/or services by Mr. Fareri, Development and other insiders and affiliates, as well as a secured construction loan from Sterling in the original principal amount of $50 million, which loan was later effectively replaced in April 2018 by an approximately $14,626,500 mortgage loan following substantial completion of the construction phase of the Project.  To date, Kensington has liquidated around forty-eight (48) condominiums for a collective gross sale price of approximately $90.1 million.  Kensington is in the process of selling its remaining assets in this proceeding, including around six (6) remaining condominium units that are estimated by the Debtor to have an aggregate value of between $9.5 and $11 million.[7]

---

[4] The Examiner especially wants to thank the legal teams for the Debtor, Mr. Carnicelli and Mr. Fareri, who were in almost all instances responsive, courteous, and respectful of the Examiner and his charge.  The Development Trustee and counsel to Sterling were also extremely responsive and courteous with respect to their limited interaction with the Examiner during the Investigation.

[5] It is important to note that this Investigation was conducted over a short period and that the Examiner was necessarily reliant on voluntary cooperation of the parties.  No assurances can be given that all relevant documents were produced or that no other relevant information or evidence would be revealed in formal discovery bearing on the matters discussed in this Report.  The Examiner shared a draft of this Report with the parties on January 17, 2022 (the "Draft Report") and invited feedback and comments.  The Examiner has addressed certain concerns, issues and arguments received from the parties in this final Report.

[6] Mr. Fareri's spouse owns a one (1%) percent interest in Kensington, with Mr. Fareri owning the ninety-nine (99%) percent remainder.

[7] Certain of these units may have already been liquidated during the course of Kensington's case.

While currently insolvent, Kensington may certainly be characterized as a financially successful project, providing over $21 million[8] in net profit distributions to its owners to date, plus direct payments to its owners by the State of New York on account of BTCs equal to more than $8.9 million[9] with another approximately $2 million in BTCs available.[10]

**C. Why is Kensington in Bankruptcy and What is its Bankruptcy Case About?**

As outlined above, Kensington is a very successful project with around $30 million in aggregate value flowing to its owners to date. For most of its existence, Kensington generally satisfied its debts as they came due. However, a significant dispute between longtime close colleagues Messrs. Fareri and Carnicelli resulted in the entry of an arbitration award on or around April 25, 2021, against Kensington and in favor of Development in the total amount (including interest) of $14,333,446.38 (the "Arbitration Award"). See *James Carnicelli, Jr. derivatively on behalf of The Gateway Development Group, Inc. v. Gateway Kensington, LLC*, AAA Case No. 01-19-0004-4927 (the "Arbitration").[11]

Kensington commenced its bankruptcy case on May 14, 2021 (the "Petition Date"), by filing a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), almost immediately after issuance of the Arbitration Award, for the purpose of, among possibly other things, liquidating its remaining assets, staying an action seeking to confirm the Arbitration Award and enter a judgment, and ultimately proposing and confirming a plan. The Development Trustee timely filed a proof of claim against Kensington's bankruptcy

---

[8] This figure is derived from netting the $49,248,608.18 in distributions to Mr. Fareri from the $27,848,855.86 in investments made by Mr. Fareri. These numbers were taken directly from Kensington's books and records without adjustment by the Examiner.

[9] Mr. Fareri received direct payments from the State of New York of: (i) $6,284,540 on August 18, 2018 on account of a site preparation BTC, and (ii) $2,668,482.13 on September 10, 2020 on account of a tangible property BTC.

[10] Mr. Sheskier represented that Kensington's owners are entitled to another approximately $2 million in tangible property BTCs for the 2018 tax year, that they intend to apply for in 2022.

[11] Mr. Carnicelli brought and prosecuted the Arbitration derivatively on Development's behalf.

estate asserting a general, unsecured claim in the full amount of the Arbitration Award [Claim No. 3-1] (the "Development Claim"). As of the Petition Date, the Debtor's assets were insufficient to satisfy its liabilities inclusive of the Development Claim. The amount of the shortfall in asset value necessary to satisfy all claims against Kensington is estimated by the Examiner to be between $5.8 and $8.3 million and is subject to at least the following variables: (i) the sale price of remaining condominium units; (ii) the value of the Debtor's condominium in Naples, Florida; (iii) the administrative cost of completing the bankruptcy case (an estimate of $700,000 was included in the Examiner's calculation); and (iv) the allowance or disallowance of Insider Claims (the "Estate Shortfall").[12] The identifiable means of making up the Estate Shortfall would be from the successful prosecution of any Estate Claims that are the subject of the Investigation.

### D. Note Regarding the Interpersonal Disputes and Neutrality of Examiner

The Examiner wants to make very clear that he makes no judgment and takes no position concerning the relative merits of the personal disputes between Messrs. Fareri and Carnicelli. The two have suffered a significant falling out after a long and trusting personal and professional relationship. Like most interpersonal disputes of this kind, this one appears to be rife with emotion, and with decision-making that is not always rooted in fiscal prudence. However, the Examiner's experience with both parties has been very positive. The Examiner has found both to be courteous, earnest, and helpful. The Examiner has little doubt that both Messrs. Fareri and Carnicelli and their respective professional teams will be disappointed by, and take issue with, different aspects of this Report and the results of the Investigation. The Examiner has, however, approached the

---

[12] The Examiner's calculation of the estimated Estate Shortfall is included as Exhibit A to this Report. Unless otherwise stated herein, all references to "Exhibits" in this Report refer to exhibits set forth in the *Compendium of Exhibits to Report of Fred Stevens, Examiner*, a copy of which is being provided by the Examiner to the Court, the UST, the Debtor, Mr. Fareri, Mr. Carnicelli, the Development Trustee and Sterling.

Investigation as a true neutral and encourages the constituents not to take anything contained in or omitted from this Report personally, nor to interpret this Report as anything other than the Examiner's impartial assessment of the facts and circumstances.

### E. Summary of Examiner's Conclusions

Following the Investigation, the Examiner makes the following general conclusions:

(i)  while significant, the size of the Estate Shortfall is relatively modest when considering the amount of Estate Claims that could be asserted, and the costs and delays associated with litigating any Estate Claims to final conclusion[13];

(ii)  the Estate has significant unencumbered funds from which to litigate Estate Claims if a consensual resolution cannot be reached and a trustee (or other party with STN authority) were to pursue such claims, and thus, there is a strong incentive to resolve matters consensually and minimize the ultimate Estate Shortfall by limiting the Estate's administrative expenses;

(iii)  the Estate Claims against Mr. Fareri for any distributions that Kensington made to him or for his benefit during the three-year period preceding the Petition Date net of contributions made during the same period have a <u>very high likelihood of success</u> in litigation[14];

(iv)  the Estate Claims against Mr. Fareri for any distributions that Kensington made to him or for his benefit during the three-year period preceding the Petition Date for

---

[13] The Arbitration, which was a comparatively simple contractual dispute, cost over $1.5 million for both sides to litigation to the Arbitration Award, that the Examiner is aware of. This conclusion may change if the Examiner has grossly underestimated the Estate Shortfall.

[14] The total amount of these potential Estate Claims is between $249,550 according to Kensington and $2,817,126.57 as identified by the Examiner. An exploration of the differing amounts and reasons therefore is explored in detail in <u>Exhibit R</u> to this Report, which was prepared in response to Kensington's issues with the Draft Report.

which he asserts a dollar-for-dollar offset based upon contributions to Kensington during the same period have a <u>reasonable likelihood of success</u> in litigation[15];

(v)    there is a live, unresolved legal question regarding whether a trustee can recover wrongful distributions made to the members of a limited liability company more than three years prior to the petition date which, if resolved in the favor of a trustee for the Estate, would increase the amount of distributions that can be potentially recovered by over $12 million;

(vi)   other Estate Claims against Mr. Fareri and/or entities under his control which, if successfully prosecuted, would also result in a complete satisfaction of the Estate Shortfall, have a sufficient likelihood of success in litigation to warrant serious consideration (*i.e.*, these Estate Claims have defenses, but certainly have "settlement value");

(vii)  any Estate Claims against Mr. Carnicelli have a relatively low likelihood of monetary success in litigation[16]; and

(viii) all of the Insider Claims should be waived, expunged or recharacterized to equity, except for certain reduced claims in favor of the Development Trustee and Mr. Carnicelli as explained further herein.

For these reasons and those set forth in detail in this Report below, the Examiner concludes that the relative costs to the Estate associated with litigating the Estate Claims to their conclusion,

---

[15] The total amount of potentially offsetting contributions by Mr. Fareri during this period, and Estate Claims that fall into this category, is calculated to be between $5,690,372.30 as identified by the Examiner and $6,483,405.68 according to Kensington. An exploration of the differing amounts and reasons therefore is explored in detail in <u>Exhibit R</u> to this Report, which was prepared in response to Kensington's issues with the Draft Report.

[16] As set forth in detail herein, without discarding the potential claims against Mr. Carnicelli identified by the Debtor, the Examiner believes that such claims, if valid, are the property of Development's bankruptcy estate and not Kensington's.

together with the risk of liability on such Estate Claims for Mr. Fareri, significantly outweigh the comparatively manageable amount of the Estate Shortfall. Accordingly, the Examiner believes that the facts and circumstances here strongly suggest that Mr. Fareri and/or certain entities under his control should seek to settle and resolve any and all Estate Claims against them by sponsoring Kensington's chapter 11 plan with a monetary amount sufficient to satisfy the Estate Shortfall and thereby ensure a full distribution to the Estate's creditors. Moreover, and as part of such global resolution approach, the Examiner believes any parties who have a scheduled Insider Claim or have filed an Insider Claim should withdraw their claims or otherwise waive any right of distribution from the Estate, except for (i) the Carnicelli Claim in the reduced amount of $104,630.38, and (ii) the Development Claim, as reduced by the same $104,630.38.

Again, given the nature of the Estate Claims considered by the Examiner, the Examiner wants to make clear that he did not, nor does he need to, identify anything that qualifies as "bad behavior" by Mr. Fareri, Mr. Carnicelli, Mr. Sheskier, or anyone else within the Fareri organization, in order to arrive at his conclusions. Most of the Estate Claims considered by the Examiner are relatively dry and technical in nature. Significantly, when viewed through the prism of economic reality, the relatively large value and cost of litigation associated with the potential Estate Claims as compared to the comparatively modest size of the Estate Shortfall, focus the Examiner on this simple approach to a global resolution of the Kensington case. While continued litigation and the inherent risks and costs might make eminent sense for certain parties at the Development estate level, in the Examiner's view, such continued fighting at the Kensington level just does not.

## II.  KEY ENTITIES AND INDIVIDUALS

### A.  John J. Fareri

Mr. Fareri is a well-established and very successful developer, owner, and manager of commercial, industrial, and residential real estate, primarily in the Lower Hudson River Valley region of New York, and southwest Connecticut.  Mr. Fareri is the principal or a significant owner of over seventy (70) limited partnerships, limited liability companies, corporations and other special purpose entities involved in the ownership, development, investment, and/or management of real estate (each a "Fareri Company," collectively, the "Fareri Companies").[17]  Mr. Fareri is also well known for his philanthropy and charitable works primarily in connection with the development of the Maria Fareri Children's Hospital, a state-of-the-art facility in the Westchester Medical Center campus in Valhalla, New York named after Mr. Fareri's daughter who tragically died at the age of thirteen from a rabies infection in 1995.[18]

### B.  James Carnicelli, Jr.

Mr. Carnicelli is a real estate developer and real estate professional who began work for Mr. Fareri's organization as a Vice President in or around 2004.  For twelve years prior to that, Mr. Carnicelli was a project executive for WCI Communities Inc., a real estate management company.  Mr. Carnicelli was promoted within the Fareri organization and in 2014, was made the forty-nine (49%) percent shareholder and president of Development.  Mr. Carnicelli's employment by Development ceased in October 2019.[19]

---

[17] A list of Fareri Companies provided by Kensington is included as Exhibit B to this Report.

[18] While Mr. Fareri has enjoyed significant professional success, he has suffered unthinkable personal tragedies including the loss of two children - the passing of his 13-year-old daughter in 1995, and the loss of his adult son in 2019.

[19] The parties continue to dispute a number of issues surrounding the circumstances of Mr. Carnicelli's departure including, among other things, whether Mr. Fareri terminated Mr. Carnicelli's employment, whether Mr. Fareri had the power to terminate Mr. Carnicelli's employment, or whether Mr. Carnicelli left of his own accord.  Since characterizing the circumstances of Mr. Carnicelli's departure from Development is not material to the Investigation,

Mr. Carnicelli was awarded a claim of $104,640.38 in the Arbitration Award on account of reimbursement of administrative fees and costs of the Arbitration. Mr. Carnicelli filed a proof of claim against Kensington's Estate in the amount of $823,874.80 on account of the reimbursement awarded in the Arbitration plus $719,234.42 in attorneys' fees incurred in prosecuting the Arbitration and obtaining the Arbitration Award [Claim No. 5] (the "Carnicelli Claim").

### C. Gateway Kensington LLC

Kensington is a single purpose entity created to complete the Project. Kensington is managed by Mr. Fareri, its ninety-nine (99%) percent owner. *See* Footnote 6. Management of Kensington is governed by a certain operating agreement executed by Mr. Fareri on behalf of himself and Kensington on or around December 12, 2013 (the "Operating Agreement").[20] Mr. Fareri was Kensington's only member at the time of execution of the Operating Agreement. Mr. Fareri transferred a one (1%) percent interest in Kensington to his spouse at some point in 2015. The Operating Agreement appears to contain relatively standard terms. Relevant to this case, the Operating Agreement designates Mr. Fareri as Kensington's manager, establishes gross negligence, reckless conduct, intentional misconduct, and violations of law as the standard for review of management conduct, and expressly permits the manager and members to compete with and transact business with Kensington.

Notwithstanding the existence of the Operating Agreement, Kensington appears to have been operated with a degree of informality customary for closely held entities.

the Examiner has intentionally characterized the departure in neutral terms.
[20] A copy of the Operating Agreement is included as Exhibit C.

### D. The Gateway Development Group, Inc.

Development was formed in or around June 26, 2006 under the laws of the State of Connecticut and was a construction management firm that focused primarily on the development of projects ultimately owned by Mr. Fareri, including Kensington. Development was owned exclusively by Mr. Fareri until in or around January 1, 2014 when Mr. Fareri agreed to have Development issue ninety-eight (98) shares to Mr. Carnicelli, resulting in the reduction of Mr. Fareri's interest from one-hundred to fifty-one (100 to 51%) percent, and Mr. Carnicelli receiving a forty-nine (49%) percent stake. Mr. Carnicelli was not required to pay any new consideration for the interest, which was apparently given to him as a reward for his contributions over the preceding ten (10) years of service to Development and the Fareri organization as a whole and to encourage positive future performance. Following his receipt of equity in Development, Mr. Carnicelli served as President of Development until his departure on October 18, 2019.

Development's governance was at all relevant times governed by a certain shareholders' agreement dated as of January 1, 2014 (the "Development Shareholder Agreement")[21]. The Development Shareholder Agreement has some unique features and most significantly is completely silent on many important issues. For example, the Development Shareholder Agreement: (i) designates Mr. Fareri as the Chairman of the Board of Directors, but does not appoint or acknowledge the existence of any directors (including Mr. Fareri), or provide for the election or ouster of directors; (ii) is completely silent as to how decisions will be made, whether or how board meetings will be called, and what decisions require a majority or supermajority of directors to decide them; and (iii) fails to address the standard of review for managerial decision making.

---

[21] A copy of the Development Shareholder Agreement is included as Exhibit D.

On May 25, 2021, Development filed a voluntary petition under chapter 7 of the Bankruptcy Code in this Court and Howard P. Magaliff was appointed and is currently serving as the Development Trustee. See *In re The Gateway Development Group, Inc., Debtor*, Case No. 21-22304 (RDD) (Bankr. S.D.N.Y. May 25, 2021). Mr. Fareri made the decision to wind-down Development's business and ultimately file Development's Chapter 7 petition as a result of the disagreements between himself and Mr. Carnicelli as discussed in detail below.

### E. Other Involved Individuals and Entities

There are certain other individuals and entities that are relevant to the Investigation, summarized as follows:

- **500 WPA LLC** – 500 WPA LLC ("500WPA") is a limited liability company organized under the laws of the State of Delaware and registered to do business in the State of Connecticut on or around June 9, 2016. 500WPA is owned and/or managed predominately by Mr. Fareri. According to Kensington's schedules, 500WPA is owed $600,000 by Kensington on account of a loan for legal fees (the "500WPA Claim").

- **Christopher Sheskier** – Mr. Sheskier is the Chief Financial Officer for Fareri Associates, L.P., a limited partnership, and effectively serves as the controller/financial executive and Chief Financial Officer for all of the Fareri Companies.[22]

- **Fareri Associates, L.P.** – Fareri Associates, L.P. ("Fareri Associates") is a limited partnership organized under the laws of the State of New York on or around February 28, 2006, at or around the time of dissolution of an entity of the exact same name which had been in business since May 23, 1994. Fareri Associates is the entity that Mr. Fareri

---

[22] Mr. Sheskier has denied having any title with respect to Kensington or Development.

utilizes to conduct most business through in the first instance. Among other things, Fareri Associates was the entity that submitted and won the bid for the Project before assigning it to Kensington.

- **Greenwich Premier Services Company** – Greenwich Premier Services Company ("GPSC") is a corporation organized under the laws of the State of Connecticut on or around January 3, 2000, for the purpose of engaging in the real estate rental, leasing and management businesses. GPSC is owned and/or managed by Mr. Fareri and his daughter Julienne Zielinski. According to Kensington's schedules, GPSC is owed $1,088,927.10 by Kensington on account of advances for cash flow shortages (the "GPSC Claim"), and GPSC received $432,713.80 from Kensington on August 17, 2020 on account of antecedent debts (the "GPSC Transfer").

- **Wescorp** – Wescorp is a construction company owned by Mr. Fareri. According to Kensington's schedules, Wescorp is owed $33,499.14 by Kensington on account of supplies or services provided (the "Wescorp Claim"), and Wescorp received a total of $39,770.42 from Kensington from June 26, 2020 to September 9, 2020 on account of alleged antecedent debts (collectively, the "Wescorp Transfers").

## III. RELEVANT CASE BACKGROUND

### A. The Project

Fareri Associates bid on and was selected by the Town of Bronxville as the developer of the Project. Farari Associates later assigned the contract to purchase the underlying real property to Kensington. Kensington retained Development as its construction manager and general contractor for the Project. The Project had a brownfield component where Kensington, a pass-

through entity for tax purposes, could obtain BTCs for remediating and developing the Project site. The BTCs were available for contamination remediation, site preparation and construction.

Kensington commenced work on the Project in or around May 5, 2014 and completed site preparation and remediation work in 2016. Kensington received a certificate of completion (the "COC") of remediating the Project site by the New York State Department of Environmental Conservation ("NYS DEC") on December 28, 2016, thus entitling it to apply for BTCs for the site preparation phase of the Project. Thereafter, Kensington began the condominium construction phase of the Project which it largely completed by late-2017, thus entitling it to apply for BTCs for the tangible property creation portion of the Project. As of the date of this Report, Kensington has sold around forty-eight (48) units for a collective gross sales price of $90.1 million, with six (6) units remaining to be sold with an estimated value of between $9.5 million and $11 million.[23]

### B. Overview of Brownfield Tax Credits

A basic understanding of New York State's Brownfield Cleanup Program ("BCP") is important to framing certain of the issues in this case. Further, investigation of the BTCs was an enumerated requirement of the Examiner pursuant to the Examination Order. There is a short review of the BCP and BTCs below. For a more thorough explanation, the Examiner includes as Exhibit G the report of his special counsel, Mintzer Mauch (the "MM Report").

New York State established a voluntary cleanup program to address contamination at brownfield sites in 1994 and the formal BCP was established by statute in 2003. See N.Y. Env. Conserv. Law ("NYECL"), Art. 27, tit. 14 and 6 NYCRR Part 375. Under the BCP, volunteers or participants that have entered into a Brownfield Cleanup Agreement (a "BCA") with the NYS

---

[23] A comprehensive list of the condominium units sold by Kensington and that remain to be sold with relative sales prices and values as prepared by Kensington is included as Exhibit E. The Examiner has prepared his own analysis of condominium closings included as Exhibit F.

DEC for investigation and remediation of contamination become eligible for the BTC upon receiving a COC from NYS DEC indicating the investigation and remediation has been completed to NYC DEC's satisfaction. MM Report, p.2.

The BTC consists of the sum of three discrete components involving costs authorized by New York Tax Law ("NYTL") § 21 relating to: a) a site preparation/remediation necessary to qualify for a COC; b) groundwater remediation[24]; and c) development of a brownfield site, known as the tangible property credit component. MM Report, p.2.

An applicant must incur eligible costs in order to qualify for the BTC. See NYTL § 21(a)(6) (site preparation costs and costs or other basis for tangible property "shall only include costs *paid or incurred by the taxpayer* on or after the date of the brownfield site cleanup agreement executed by the taxpayer and the department of environmental conservation"); see also DTF Publication 300, p. 7 ("[t]he amount of the brownfield redevelopment tax credit is a percentage of the eligible *costs paid or incurred* to cleanup and redevelop a qualified site") (emphasis added). MM Report, p.2.

As noted above, the COC qualifies the applicant to financial benefits in the form of a tax credit pursuant to the New York Tax Law. See Lighthouse Pointe Prop. Assocs. LLC v. N.Y. State Dep't of Envtl. Conserv., 14 N.Y.3d 161 (2010); Tax Law § 21(a)(2)-(3) and 21(b)(1). MM Report, p.2.

To claim the BTC, an applicant submits the COC with its tax return and the requisite Brownfield Remediation Tax Credit Form(s) (depending on the tax status of the applicant, *e.g.*, corporation, individual, LLC) demonstrating the costs for which tax credits are being sought along

---

[24] The on-site groundwater remediation credit was not claimed by Kensington as part of the BTC.

with portions of the various reports submitted to NYS DEC over the course of the remediation. New York State Department of Taxation and Finance ("NYS TAX") then verifies the claim through an audit process. Upon completion of the audit, NYS TAX determines whether and to what extent the claimed BTC is allowed. "If the amount of the credit allowed . . . for any taxable year shall exceed the taxpayer's tax for such year, the excess shall be treated as an overpayment of tax to be credited or refunded . . . ." NYTL § 606(dd)(2). MM Report, pp.2-3.

Kensington and its ultimate taxpayers, Mr. and Mrs. Fareri, have applied for and received or are eligible to apply for the following BTCs:

(i)    Site Preparation/Remediation BTC – Following an application and audit process, Mr. Fareri received $6,284,540 from NYS TAX on August 8, 2018 on account of Kensington's site preparation and remediation BTC.[25]

(ii)   2017 Tangible Property BTC – Following a lengthy application and audit process, Mr. Fareri received $2,668,482.13 from NYS TAX on September 10, 2020 on account of Kensington's tangible property BTC for expenses paid in 2017.

(iii)  2018 Tangible Property BTC – Mr. Sheskier has informed the Examiner that there are another approximately $2 million in tangible property BTCs available for expenditures made in 2018 that will be applied for in 2022.

## C.  The Falling Out Between Messrs. Fareri and Carnicelli

Messrs. Fareri and Carnicelli were, by all accounts, very close professional colleagues and friends following the Fareri organization's employment of Mr. Carnicelli in 2004 until just prior

---

[25]  It was the Examiner's understanding that Mr. and Mrs. Fareri applied for acceptance into the State's tax amnesty program with respect to this BTC in an attempt to return all or a portion of it and avoid any negative legal consequences of having submitted the application.  However, certain documents were produced to the Examiner on January 4, 2022 indicating that the request had been withdrawn on May 28, 2021, fourteen (14) days after the Petition Date, and that the taxpayers intended to retain the payment.

to Mr. Carnicelli's departure from Development in October 2019. It is undisputed that Mr. Fareri gave Mr. Carnicelli a forty-nine (49%) percent stake in Development without requiring Mr. Carnicelli to make a monetary contribution. What is of significant dispute, however, is exactly what that stake in Development entitled Mr. Carnicelli to. In order to really understand the dispute, it is important to examine how the two parties viewed Development's relationship to the other Fareri Companies.

In Mr. Carnicelli's view, he was a true partner of Mr. Fareri's with respect to Development's construction management business and should have shared nearly equally with Mr. Fareri in any of Development's financial success. Mr. Carnicelli admits that he had no interest or partnership with Mr. Fareri in the other Fareri Companies,[26] most of which involved discrete real estate development projects. Accordingly, while in Mr. Carnicelli's view he was entitled to his allocable portion of Development's profits, he had no entitlement to the profits of any other Fareri Companies, including Kensington. This put Mr. Carnicelli in the unique position of being almost singularly interested in Development's financial performance rather than the performance of the Fareri Companies as a whole. Indeed, Mr. Carnicelli appears to be the only person within Mr. Fareri's organization who was uniquely invested in the interests of just one Fareri Company as opposed to the collective. Consistent with this idea, Mr. Carnicelli contends that Development should have conducted its business with other Fareri Companies in the same way that it would have if it were dealing with unrelated third parties, such that Development should have established and enforced competitive agreements with other Fareri Companies at market rates of return.

---

[26] According to Mr. Fareri, Mr. Carnicelli may have an ownership interest in Old Crompond Road LLC, another Fareri Company.

Mr. Fareri's view was quite different from Mr. Carnicelli's. Mr. Fareri conducts business through numerous entities that he almost entirely owns and/or controls. Like most closely held and affiliated entities, the Fareri Companies do not behave with each other in the same way that they would if they were owned and managed by unrelated parties. For example, the Fareri Companies typically conduct all manner of business with one another without formality or written agreements unless required by a third-party lender. Indeed, the same individual often acts simultaneously on behalf of each of the interacting Fareri Companies. Indeed, Mr. Sheskier appears to have broad discretion and authority to allocate capital in and among all of the Fareri Companies based upon Mr. Sheskier's assessment of the capital requirements of the various Fareri Companies. In most cases, it simply does not matter how one Fareri Company fairs when dealing with another Fareri Company because to the extent they are all owned predominately by Mr. Fareri, the concern is only with the financial health of the organization as a whole and not with any single component.

In point of fact, Kensington appears to have retained very little if any capital during most periods and would instead distribute all excess funds almost immediately upon receipt to Mr. Fareri. The course of dealing suggests that Kensington would, at nearly every opportunity, incur debt through secured financing or bonding purchase deposits in order to make distributions to Mr. Fareri. Correspondingly, Kensington would then seek capital contributions from Mr. Fareri whenever needed. Capital was routinely transferred back and forth between Kensington and Mr. Fareri. While Mr. Sheskier never had actual signature authority on Kensington's bank accounts, he did appear to have authority to allocate capital throughout the organization. This was presumably done under a general instruction to allocate capital as required to make the entire organization run smoothly. This view and manner of conducting business are, in the Examiner's

experience, not uncommon for closely held entities. Indeed, there is really nothing wrong with this capital management approach, provided, however, that each of the Fareri Companies pays its debts. That said, this informal way of conducting business can create a very serious issue where, as is the case here, one company has materially different ownership than the other and/or fails to pay its debts as they come due.

After receiving his large minority stake in Development, Mr. Carnicelli claims that Mr. Fareri kept treating Development the same way that he would if it were just another Fareri Company and Mr. Carnicelli was not an equity holder. He further asserts that Development was not being fairly compensated for the work that it was performing for other Fareri Companies, principally Kensington. Mr. Carnicelli admits that he did not address any of his concerns with Mr. Fareri right away and that he waited until Kensington largely completed the Project and had sold a significant number of condominiums before raising his concerns in or around 2019. Mr. Carnicelli also claims that addressing the issue with Mr. Fareri was necessarily delayed for a period following the tragic death of Mr. Fareri's son in early 2019, with discussions between Messrs. Carnicelli and Fareri commencing in earnest in the summer of 2019.

While Mr. Carnicelli has no ownership interest in Kensington, the dispute between Messrs. Fareri and Carnicelli seems to have come to a head over Kensington and the Project. In Mr. Carnicelli's view, he was the driving force behind successfully sourcing and completing the Project through Development and Development was consequently entitled to an appropriate portion of Kensington's financial success equal to the fair market value of the services that Development had provided. Mr. Fareri on the other hand disagreed with Mr. Carnicelli's view of what Development was entitled to and the terms of Development's agreement with Kensington.

If Mr. Carnicelli's view of the world were accepted, his minority stake in Development might have entitled him to around $6 million in distributions from Development in connection with the Project alone without considering other projects where Development was involved. It is unclear whether Mr. Fareri really intended to transfer this level of earning potential to Mr. Carnicelli when he gave Mr. Carnicelli the stake in Development years earlier, or if he simply thought better of it later when the potential value became apparent.

In the end, neither Mr. Fareri nor Mr. Carnicelli was willing to back down or materially alter their opposing views outlined above. While Mr. Fareri was willing to give Mr. Carnicelli something in addition to Mr. Carnicelli's $250,000 annual salary from Development in connection with the Project, it was nowhere near the over $6 million that Mr. Carnicelli believed that he was legally entitled to. When it was clear that no resolution would be had, Mr. Carnicelli's employment by Development ceased in October 2019.[27]

As discussed at length below, Mr. Carnicelli began pursuing his claims initially by way of an arbitration on behalf of Development and against Kensington seeking damages for breach of a contract between the two companies. Mr. Carnicelli also asserts that Development has legitimate claims against not only Kensington but also against Mr. Fareri and other Fareri Companies, and that he is consequently entitled to his distributive portion of those claims as a large creditor and minority stakeholder in Development.[28] Those additional claims are outside the scope of the Examiner's Investigation.

---

[27] There is an unresolved dispute regarding whether Mr. Fareri actually had the power to terminate Mr. Carnicelli's employment under the terms of the Development Shareholder Agreement.
[28] Mr. Carnicelli filed proof of claim no. 4-1 against Development's estate asserting a general unsecured claim in the amount of $299,014,189.55.

### D.  The Arbitration

#### i.  *The Dueling Contracts*

There are two conflicting contracts between Kensington and Development that were the subject of the dispute at Arbitration.   Both contracts generally provided for Development's management of the Project.  The basic terms and characteristics of the dueling contracts can be summarized as follows:

|  | Contract 1 | Contract 2 |
|---|---|---|
| **Date on Contract** | December 7, 2015 | as of May 5, 2014[29] |
| **Date of Execution** | Not known (not relevant) | on or around March 9, 2018, almost four years after its date and after most of the Project was completed |
| **Who Executed?** | Not known | Mr. Fareri for Kensington and<br><br>Mr. Carnicelli for Development |
| **Development's Fee** | $0 | 10% on the cost of work plus $1.25 million bonus conditioned on early completion of the Brownfield remediation work |
| **How was Development's Fee Determined?** | Arbitrary/unknown | Rates for Development's personnel based upon market rates as found in RSMeans estimating guide and as recommended by expert(s) employed by Kensington or Development |
| **Did the Parties Perform Under the Contract?** | For the most part, yes (Development issued regular invoices consistent with the agreement and Kensington paid them) | No.  Mr. Fareri maintained that the contract was a fraud designed by those employed by him to fraudulently maximize Mr. Fareri's own BTCs.  While Mr. Fareri originally applied for amnesty from NYS TAX in connection with the self-identified "fraud", he later withdrew that application upon |

---

[29] A copy of Contract 2 is included as <u>Exhibit H</u>.

|  | **Contract 1** | **Contract 2** |
|---|---|---|
|  |  | losing the Arbitration and has retained the BTCs given based upon the amounts in Contract 2. |
| **Reason Contract Was Entered Into** | According to Mr. Carnicelli, the contract was only entered into for purposes of showing the lender (Sterling) that a contract existed. Neither Mr. Carnicelli nor Mr. Fareri assert that Contract 1 represented the actual deal between the parties, although Mr. Fareri vehemently denied that Contract 2 did either. | Created and backdated in response to NYS TAX audit of BTC request to match what was previously submitted to NYS TAX by Kensington as the costs incurred by Kensington to Development |

Mr. Carnicelli's claim in the Arbitration was characterized by the panel as "straightforward" seeking to enforce Contract 2, which would result in Kensington paying millions of dollars to Development, and thus, entitling Mr. Carnicelli to his allocable portion as the owner of forty-nine (49%) percent of Development.

At first, Kensington did not argue that Contract 2 was unenforceable and even asserted counterclaims against Development based on the terms of Contract 2. Kensington then changed its position in the Arbitration and Mr. Fareri specifically claimed to be unaware that (i) Contract 2 was inconsistent with the actual billings of Development, (ii) the tax credit submissions to NYS TAX and his personal tax returns included costs based upon Contract 2, or (iii) new, backdated invoices were created by Development and submitted by Kensington to NYS TAX. Mr. Fareri admitted and has maintained that the submissions to NYS TAX were both fraudulent and improper, and that he has made amended submissions resulting in the surrender of certain BTCs to New York State consistent with that position. However, it was revealed to the Examiner on January 4, 2022 that Mr. Fareri had withdrawn a November 2020 request to NYS TAX for amnesty on May 28, 2021, seemingly indicating that he now accepts the validity of Contract 2 and intends to retain the BTCs provided as a result of the amounts set forth in Contract 2.

Prior to the newly discovered withdrawal of the tax amnesty request, Mr. Fareri essentially maintained that although he was the sole beneficiary of the BTCs, Mr. Carnicelli and/or Mr. Sheskier committed a fraud upon NYS TAX in connection with enhancing those BTCs through the agreement embodied in Contract 2. Mr. Carnicelli vehemently denies having committed any fraud or that Contract 2 did not in fact represent the true agreement between Development and Kensington. Mr. Sheskier invoked his Fifth Amendment right at pivotal times during the Arbitration and refused to answer questions that may implicate him in the fraud. When asked similar questions by the Examiner here, Mr. Sheskier answered them without asserting any privilege but asserted that he could not speak for Kensington.[30]

### ii. The Relevant Timeline

The timeline relevant to the dispute at Arbitration and the relationship between the parties is summarized as follows:

| Date/Timeframe | Event |
|---|---|
| 2004 | Mr. Carnicelli started working for the Fareri organization as a Vice President |
| June 26, 2006 | Development was formed |
| December 12, 2013 | Kensington was formed |
| January 1, 2014 | Mr. Carnicelli received a forty-nine (49%) percent stake in Development |
| May 5, 2014 | Kensington began work on the Project (this is also the effective date of Contract 2 referenced below) |
| December 7, 2015 | Date of Contract 1 between Kensington and Development providing for Development's management of the Project – the parties continued to basically perform consistent with the terms of this contract but maintained that it did not reflect the "real deal", but was necessary to show Sterling as the construction lender |
| December 28, 2016 | NYS DEC issued the COC on remediation site preparation work for the Project |

---

[30] The Examiner admittedly did not press hard on these issues because he did not believe them to be directly relevant to the Investigation or Estate Claims.

| Date/Timeframe | Event |
|---|---|
| September 10 to 15, 2017 (estimated) | Kensington filed IT-611.1 with schedules to NYS TAX requesting tax credits for the site preparation and remediation work completed in 2016 (the "2016 BTC Request") that included the amounts allegedly due Development ultimately found in Contract 2[31] |
| December 30, 2017 | NYS TAX issued letter indicating an audit of the 2016 BTC Request and asking for, among other things, the contract and information related to the relationship between Kensington and Development |
| March 9, 2018 | Contract 2 was created and signed by Mr. Fareri on behalf of Kensington and Mr. Carnicelli on behalf of Development reflecting the new amounts claimed in the 2016 BTC Request – Modified invoices are also created for Development to Kensington |
| July 1, 2018 | NYS TAX completed its audit with respect to the 2016 BTC Request and certified a $6,284,540 BTC for the site preparation and remediation work |
| August 8, 2018 | NYS TAX paid $6,284,540 to Mr. Fareri on account of the approved 2016 BTC Request |
| September 10 to 15, 2018 (estimated) | Kensington filed IT-611.1 with schedules to NYS TAX requesting a tangible property tax credit for work completed in 2017 (the "2017 BTC Request") that also included the amounts for Development ultimately found in Contract 2[32] |
| October 18, 2019 | Mr. Carnicelli's employment by Development ceased and Mr. Carnicelli left Mr. Fareri's organization |
| November 8, 2019 | Mr. Sheskier had a conversation with NYS TAX where he indicated that Kensington made errors in its 2017 BTC Request discovered during an internal audit and that the request would be amended |
| December 30, 2019 | Mr. Sheskier sent a letter on Mr. Fareri's personal letterhead to NYS TAX Audit Bureau with amended 2017 BTC Request eliminating all Development labor charges[33] |
| September 10, 2020 | NYS TAX paid $2,668,482.13 to Mr. Fareri on account of the 2017 BTC Request (note that audit finality letter does not come for another 4 days) |
| September 14, 2020 | NYS TAX completed its audit with respect to the 2017 BTC Request and certified a $2,697,634 BTC for tangible property expenditures in 2017 |
| November 25, 2020 | The Fareris submitted a voluntary disclosure application with NYS TAX stating that the 2016 BTC Request was overstated based upon the Contract 2 amounts |

[31] A copy of the 2016 BTC Request is included as Exhibit I.
[32] A copy of the 2017 BTC Request is included as Exhibit J.
[33] Copies of these documents are included as Exhibit K.

| Date/Timeframe | Event |
|---|---|
| | and requesting authority to modify it, as well as a request for criminal and civil amnesty in connection with any wrongdoing[34] |
| April 25, 2021 | Arbitration Award is issued |
| May 14, 2021 | Kensington's Petition Date |
| May 28, 2021 | Mr. and Mrs. Fareri's accountants sent an email to NYS TAX indicating that the amnesty application in connection with the 2016 BTC Request is being withdrawn |

### iii. The Arbitrators' Decision and Points of Interest

The arbitrators agreed with Mr. Carnicelli and found that Contract 2 was the valid and binding obligation of Kensington and that its terms should be enforced, awarding Development $12,717,357 in damages plus interest at the rate of 9% per annum beginning December 31, 2019 in the Arbitration Award. The arbitrators cited numerous reasons for agreeing with Mr. Carnicelli, the most noteworthy of which are as follows:

1) <u>Mr. Fareri Executed Contract 2</u> – Mr. Fareri freely admitted that he executed Contract 2 on behalf of Kensington and "[Mr.] Fareri is a sophisticated businessman who is bound by documents he willingly executed including the Contract [2]."

2) <u>Kensington's Change in Position</u> – At first Kensington did not challenge the validity of Contract 2 and even asserted counterclaims in the arbitration premised upon Contract 2's legitimacy. Only later in the arbitration did Kensington change its position, drop its counterclaims, and challenge the validity of Contract 2.

3) <u>Lack of Credible Alternative</u> – While Kensington challenged the existence of Contract 2, it did admit that Development was owed something in addition to what was provided

---

[34] A copy of this request and disclosure is omitted as an Exhibit because it was produced to the Examiner on a Confidential basis by Mr. Fareri, although Mr. Carnicelli has indicated that he already received a copy of a similarly described document in connection with the Arbitration.

for in Contract 1 in connection with the Project but could not state what was owed or why.

4) <u>Kensington and/or Mr. Fareri Claimed BTCs</u> – Kensington and/or Mr. Fareri requested, claimed, and received BTCs based upon the amounts owed to Development reflected in Contract 2.

5) <u>Timing of Change</u> – Kensington and Mr. Fareri changed their claim for BTCs <u>only</u> <u>after</u> the dispute arose with Mr. Carnicelli.

6) <u>Continued Employment of Claimed Fraudster</u> – Mr. Fareri claimed that Contract 2 and Kensington's requests for BTCs were actually fraudulent and were prepared by, among others, Mr. Sheskier. However, even though Mr. Fareri all but accused Mr. Sheskier of fraud, he continued (and continues) to employ Mr. Sheskier and hold him in a position of significant trust. The arbitrators appeared to find it difficult to fathom that Mr. Fareri would keep Mr. Sheskier in his employ if he really did those things without Mr. Fareri knowing.

In the end, the arbitrators appeared to find Mr. Carnicelli's position clear, consistent, and simple, while Mr. Fareri's position was laden with inconsistencies and things the arbitrators could not logically reconcile. The Examiner has no reason or basis to revisit the well-supported decision of the panel in Arbitration and has adopted the panel's conclusions and factual findings for purposes of this Report.

### E. Kensington's Bankruptcy Case and Appointment of the Examiner

On April 25, 2021, the arbitrators entered the Arbitration Award which kicked off a series of responses by Mr. Fareri. First, on May 14, 2021 (the Petition Date), Kensington filed for relief under Chapter 11. Eleven (11) days later, on May 25, 2021, Development filed for relief under

Chapter 7. Mr. Carnicelli responded to both moves aggressively. Less than two (2) months into Kensington's case, Mr. Carnicelli filed a motion seeking the appointment of a Chapter 11 trustee to take charge of Kensington's business [Docket No. 39], and only ten (10) days into Development's case, Mr. Carnicelli filed a motion to dismiss the bankruptcy case as well as a motion to reconsider the Court's order authorizing the Development Trustee's retention of Zeisler & Zeisler, P.C. as his counsel [Development Docket Nos. 17, 19, 20 and 23].

After significant legal sparring by and amongst Mr. Carnicelli, Mr. Fareri, Kensington, Development and the Development Trustee, the parties appear to have agreed to a standstill on most litigation in Kensington's case (but not Development's) and to the appointment of the Examiner in Kensington's case.

### F. The Transfers at Issue to the Investigation and this Report

The Examiner has been charged with, among other things, investigating the Estate Claims with respect to the potential recovery of various transfers made to Mr. Fareri and/or Fareri Companies including approximately $49 million in money, services or things of ascertainable value as set forth in detail on the chart prepared by Kensington and included as <u>Exhibit L</u> and in the Examiner's independent analysis of such transfers included as <u>Exhibit M</u> (before taking into account approximately $28 million in value provided back to Kensington), and approximately $8.9 million in BTCs claimed and received from NYS TAX, plus another estimated $2 million in entitlement to BTCs.[35] The Examiner has also investigated payments made to Fareri Companies during year prior to the Petition Date of $39,770.42 to Wescorp and $432,713.80 to GPSC.

---

[35] This number is estimated because it remains somewhat unclear what BTC for 2018 tangible property expenditures will be sought. The estimate was provided by Mr. Sheskier. The approximation of this number is immaterial to the conclusions of the Examiner's Investigation set forth in this Report.

### G.  The Insider Claims at Issue

The Insider Claims examined by the Trustee are summarized as follows:

| Scheduled or Claim No. | Claim | Relationship of Claimant | Classification | Amount |
|---|---|---|---|---|
| Scheduled | 500WPA Claim | Affiliate | General Unsecured | $600,000.00 |
| Claim No. 5 | Carnicelli Claim | Development Shareholder | General Unsecured | $823,874.80 |
| Claim No. 3 | Development Claim[36] | Affiliate | General Unsecured | $14,333,446.38 |
| Scheduled | GPSC Claim | Affiliate | General Unsecured | $1,088,927.10 |
| Scheduled | Wescorp Claim | Affiliate | General Unsecured | $33,499.14 |

### H.  The Examiner's Work Plan for the Investigation

The Examination Order did not require the Examiner to submit any work plan or budget in connection with the Investigation, and accordingly, the Examiner did not expend any resources on these tasks.  The Examiner did, however, discuss his approach to the Investigation, all major facets of the Investigation, and the retention of all professionals in detail with the legal teams for the Debtor, Mr. Fareri and Mr. Carnicelli.

It is important to mention that when the Examiner was first appointed, the parties appeared to presume that the Examiner's role was relatively simple and would require him to just precisely identify transfers made by Kensington to its owners, many of which had already been identified by Mr. Carnicelli.  While this is an accurate description of the Examiner's charge in its simplest form, the Examiner quickly discovered that the Investigation was actually far more complicated

---

[36]  The Examiner is charged with the obligation to investigate the propriety of Insider Claims so the Development Claim is necessarily included in this chart.  However, as stated above, the Examiner sees no basis to disturb the Arbitration Award, and accordingly, does not see any basis to challenge the Development Claim, except for a slight adjustment to ensure Development and Mr. Carnicelli are not making a claim for the same charge.

than that. Among other things, the Examiner discovered the following significant matters and complexities that were not clearly identified by the parties: (i) the importance of the adequacy of Kensington's capital and Kensington's solvency at various points; (ii) the significance of the precise timing of accrual of the Development Claim; (iii) certain potential legal limitations on claims presumed possible by certain parties; (iv) the identity and complexity of a number of relevant lending transactions and intercompany relationships discovered by the Examiner; (v) the lack of legal authority that would permit the Examiner to determine with a high degree of certainty the issues over the potential avoidance of transfers of BTCs[37]; and (vi) the lack of a reliable liquidation analysis for Kensington's Estate necessary to frame the issues in economic context.

The Examiner (and perhaps certain parties) did not appreciate the foregoing complexities and issues at the time of the Examiner's appointment. The Examiner has made efforts to keep the parties apprised of these developments and discoveries as well as their perceived significance as early and often as possible.

### I. The Methods Employed to Conduct the Investigation

In light of the complex nature of the Investigation and the Estate Claims that are the subject thereof, the Examiner engaged KWJS&S, a boutique firm experienced in bankruptcy litigation, to serve as his general counsel, and Mintzer Mauch[38], a firm experienced with the BCP and submission and review of BTCs, as his special counsel in connection with certain tax and environmental matters. Additionally, the Examiner utilized and leveraged work performed by

---

[37] The nature of property rights in tax credits granted under a brownfield program is an extraordinarily complicated issue. When first presented, both sides were equally definitive that their view on this issue was the right one. The Examiner has spent a significant amount of time on this specific issue with both bankruptcy counsel and special tax and environmental counsel and as explained below, is still unable to definitively opine on it.

[38] Helen Mauch, a name partner of Mintzer Mauch, was independently consulted briefly by both Mr. Carnicelli's and Kensington's counsel prior to the Examiner's appointment. The Examiner confirmed that this did not present a conflict and both parties supported the Examiner's retention of Miller Mauch.

counsel to Mr. Carnicelli in the Arbitration and in identifying Estate Claims to the extent that it was relevant to the Investigation.

The Examiner obtained documents from the Debtor, Mr. Fareri, and Mr. Carnicelli. In total, the Examiner received and analyzed approximately 3,500 pages of documents in addition to all relevant pleadings in Kensington's and Development's bankruptcy cases.

The Examiner interviewed and met with Mr. Carnicelli and his legal team a number of times both in person and remotely, spoke with the Development Trustee at length, spoke with Kensington's and Mr. Fareri's counsel and advisers at length, spoke to Sterling's counsel at length, and examined under oath both Mr. Fareri and Mr. Sheskier in depositions that lasted over seven hours each. Parties in interest were given nearly unfettered access to the Examiner and the opportunity to submit any documents, information, legal arguments, or position statements that they wanted the Examiner to consider.

On January 17, 2021, the Examiner circulated the Draft Report to the parties and solicited comments, criticism, and other feedback. The Examiner has made an effort to address the comments received in this Final Report. While a number of the comments warranted inclusion and discussion in this Final Report, the Examiner did not rescind or substantially modify the general conclusion set forth in the Draft Report that the settlement value of Estate Claims is, in the Examiner's view, greater than the Estate Shortfall.

## IV. DOES KENSINGTON'S BANKRUPTCY ESTATE HAVE ANY VALID ESTATE CLAIMS TO ASSERT?

The biggest question for the Examiner is whether there are valid Estate Claims that will likely result in a recovery for the benefit of the Estate if pursued. The Examiner explores that question and answers it in detail below.

### A. Summary of Potential Claims Outlined by Carnicelli

Through counsel, Mr. Carnicelli has asserted that all of the distributions and BTCs received by Mr. Fareri from Kensington or otherwise as a result of the Project are the subject of valid Estate Claims and can be recovered for the benefit of the Estate and its creditors. If Mr. Carnicelli were correct, there would be more than enough funds to recover on the Estate Claims to satisfy the Estate Shortfall at least five (5) times over. Of course, the prosecution of Estate Claims beyond what is required to cover the Estate Shortfall serves no practical purpose as any excess would just be returned to Mr. Fareri and his spouse, the owners of Kensington's equity. Accordingly, the Examiner has accepted the Estate Shortfall, albeit approximated, as an important limiting factor and lens through which to assess the viability of any Estate Claims and the wisdom of spending the time and resources necessary to pursue them.

At the time of the Examiner's appointment, Mr. Carnicelli had not fully developed the legal analysis in support of his assessment of the viability of the Estate Claims that he had identified (nor should he have), so the Examiner does that in detail here. The Examiner also explores a potential Estate Claim and legal theory that was not previously identified by Mr. Carnicelli with respect to Kensington's refinance of the Sterling construction loan in April 2018.

### B. Legal Theories of Recovery Considered in the Investigation

The legal theories underlying the potential Estate Claims considered by the Examiner are the avoidance of actual and constructive fraudulent transfers, the avoidance of preferential

transfers, and breach of fiduciary duties. In this section of the Report, the Examiner sets forth the basic legal requirements for success under each theory, and in the following Sections C to E, the Examiner considers whether such legal requirements can likely be met in this case.

### i. Avoidance of Fraudulent Transfers

Section 548(a)(1) of the Bankruptcy Code gives the trustee[39] the power to "avoid," or in other words to take back, certain transfers of property of a debtor that were transferred to a third party within the applicable lookback period. The term "transfer," as defined by section 101(54) of the Bankruptcy Code means: (A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property. The term "transfer" has been afforded an extremely broad meaning and has been interpreted to include every method of disposing of or parting with property or possession. See Hoecker v. United Bank of Boulder, 476 F.2d 838, 840 (10th Cir. 1973).

Similarly, section 544 of the Bankruptcy Code enables the trustee to "avoid" certain conveyances of property pursuant to state law. For several reasons, only the law of the State of New York applies here. First, all of Kensington's real property except for a recently acquired condominium in Naples, Florida, is located within the State of New York. Second, substantially all of Kensington's personal property has been situated and transferred within the State of New

---

[39] The Bankruptcy Code grants certain avoidance powers to a trustee appointed under chapter 7 or section 1104 of the Bankruptcy Code. However, if a debtor is in possession of its assets as is the case here at the time of issuance of the Report, the debtor has the powers of the trustee including the power to pursue avoidance actions. See 11 U.S.C. § 1107. Further, under certain circumstances, the bankruptcy court can authorize another party in the case to assert avoidance actions, which is often referred to as "STN authority" on account of the Second Circuit case recognizing this ability in In re STN Enter., 779 F.2d 901, 904 (2d Cir. 1985). Counsel to Mr. Carnicelli has expressed a willingness and desire to seek "STN authority" to pursue avoidance and other claims in this case against Mr. Fareri and the Fareri Companies.

York.[40]  Third, Kensington is a New York limited liability company.  See NY Debtor & Creditor Law (the "NYDCL"), Article 10 for transfers that occurred on or before April 4, 2020, and NY Uniform Voidable Transactions Act (the "NYUVTA") for transfers that occurred after April 4, 2020.[41]  Under the NYDCL, "conveyance" is defined very broadly, and it includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or encumbrance.  NYDCL §270.  Under the NYUVTA, "transfer" is similarly defined very broadly, and it includes every "payment of money, release, lease, license, and creation of a lien or other encumbrance."  NYUVTA §1(16).

### a)  Actual Fraudulent Transfers

In order for the trustee to recover transferred property based on section 548(a)(1)(A) of the Bankruptcy Code, otherwise known as "actual fraudulent transfers", the trustee must prove that a transfer of property of the debtor or any obligation incurred by the debtor "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C. § 548(a)(1)(A).  All of the elements set forth therein must be proven by a preponderance of the evidence, meaning that the greater weight of admitted evidence supports the trustee's case.  See Gowan v. The Patriot Group, LLC (In re Dreier LLP), 452 B.R. 391, 423 (Bankr. S.D.N.Y. 2011); Savage & Assocs., P.C. v. Mandi (In re Teligent, Inc.), 380 B.R. 324, 336 (Bankr. S.D.N.Y. 2008).

The debtor's state of mind is important to proving a trustee's actual fraudulent transfer

---

[40] While Kensington did most of its banking with the Connecticut-based The First Bank of Greenwich (Mr. Fareri owns approximately 30% of the stock of that bank), the bank has at least one branch in New York so in the Examiner's view, there is no reason to examine the law of any state other than New York under the circumstances.

[41] On December 6, 2019, New York State enacted the NYUVTA and repealed Article 10 of the NYDCL.  The NYUVTA went into effect on April 4, 2020, and accordingly, both statutory schemes are relevant here.  The NYDCL applies to all transfers that occurred on or before April 4, 2020, and the NYUCTA applies to those that occurred after.

claims under section 548(a)(1)(A) of the Bankruptcy Code, section 276 of the NYDCL and section 4(a)(1) of the NYUVTA, and must be examined to determine whether, at the time of the transfer was made, the debtor actually intended to hinder, deter, obstruct, delay or defraud, or generally get in the way of any entity to which the debtor was or became indebted.

The law permits the trustee to prove intent by circumstantial evidence known as "badges of fraud." The "badges of fraud" are:

i) Lack or inadequacy of consideration, in other words the transferee did not give the debtor sufficient value in exchange for the transfer it received;

ii) The family, friendship or close associate relationship between the parties;

iii) The retention or possession, benefit or use of the property in question, although title to the property exists in another entity;

iv) The financial condition of the debtor both before and after the transaction in question;

v) Secrecy of the conveyance or transfer;

vi) The effect of a pattern or series of transactions or behavior of the debtor after incurring debt, onset of financial difficulties, or while a creditor was threatening to file a lawsuit against the debtor;

vii) The general chronology of events and transactions under inquiry; and

viii) The questionable transfer was not in the usual course of the debtor's business.

See In re Actrade Fin. Techs. Ltd., 337 B.R. 791, 809 (citing HBE Leasing Corp. v. Frank, 48 F.3d 623, 639 (2d Cir. 1995)); and enumerated list in NYUVTA §4(b).

This is not an inclusive list and the fact finder need not find that all of the "badges of fraud" are present to determine that a debtor actually intended to hinder, deter, obstruct, delay or defraud,

or generally get in the way of any entity to which the debtor was or became indebted. In some cases, one "badge of fraud" may be enough to find that the debtor had such intent. <u>See</u> <u>In re Cassandra Group</u>, 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006). It is up to finder of fact, based upon the totality of the evidence, to determine whether the debtor actually intended to hinder, deter, obstruct, delay or defraud, or generally get in the way of any entity to which the debtor was or became indebted.

New York law also recognizes actual fraudulent transfers. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. <u>See</u> NYDCL § 276; NYUVTA § 4(a)(1) and (b).

The trustee must prove the following elements with respect to each transfer that she seeks to avoid under section 276 of the NYDCL or section 4(a)(1) of the NYUVTA:

<u>First</u>:   The debtor transferred money or property to the defendant transferee.

<u>Second</u>: The money or property was received by the particular defendant transferee within six (6) years of the bankruptcy petition date if on or before April 4, 2020, or four (4) years of the bankruptcy petition date if after April 4, 2020, except under certain circumstances discussed in Section IV(C)(i) of the Report below.

<u>Third</u>: The debtor made the transfer with actual intent to hinder, deter, obstruct, delay or defraud, either present or future creditors.

<u>Fourth</u>:  A creditor of the debtor existed at the time of the conveyance/transfer.

Actual intent must be proven by clear and convincing evidence, however, it may be inferred from the circumstances that surround the transaction, including the relationship among the parties and secrecy, haste or unusualness of the transaction. Fraudulent intent, by its very nature, is rarely

susceptible to direct proof and must be established by inference from the circumstances surrounding the allegedly fraudulent act. <u>Enron v. UBS AG and UBS Sec., LLC (In re Enron)</u>, Bankruptcy No. 01 B 16034(AJG), Adversary No 03-93373 A, 2005 WL 3873897, at *10 (Bankr. S.D.N.Y. Aug. 10, 2005) (quoting <u>Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)</u>, 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002)).

When the specific transfer is part of an overall general plan, the plan must be viewed as a whole with all its composite implications. <u>Pereira v. Checkmate Cmmc'ns Co., Inc. (In re Checkmate Stereo and Elecs., Ltd.)</u>, 9 B.R. 585, 612 (Bankr. E.D.N.Y. 1981). A clear pattern of purposeful conduct will support such a finding of actual intent to defraud. <u>In re Freudmann</u>, 495 F. 2d 816, 817 (2d Cir. 1974). Once the trustee meets her initial burden of proving a *prima facie* case of actual fraud, the burden shifts to the defendant transferee to establish that it received the transfer for fair consideration (or reasonably equivalent value under the NYUVTA) and without knowledge of fraud. <u>In re Dreier</u>, 452 B.R. 391, 435 (Bankr. S.D.N.Y. 2011).

Courts similarly apply the badges of fraud analysis under section 548(a)(1)(A) of the Bankruptcy Code to claims of actual fraud under section 276 of the NYDCL. <u>In re Sharp Int'l Corp.</u>, 403 F.3d 43, 56 (2d Cir. 2005). The language of the NYUVTA is strikingly similar to that under the Bankruptcy Code and the Examiner presumes that determination of this issue under the relatively new NYUVTA would hardly be different from courts' conclusions under the Bankruptcy Code itself.[42]

---

[42] From this point forward, the Examiner may combine examination of the law under the Bankruptcy Code with the NYUVTA given their strikingly similar and often identical statutory framework. However, all caselaw cited applies <u>only</u> to the Bankruptcy Code in light of the absence of significant discussion of the NYUVTA by courts given its recent enactment.

### b)  **Constructive Fraudulent Transfers**

In order for the trustee to recover the transferred property from a particular defendant transferee on a fraudulent transfer claim based on section 548(a)(1)(B) of the Bankruptcy Code, sections 273 to 275 of the NYDCL, or sections 4(a)(2) or 5(a) or (b) of the NYUVTA, otherwise known as "constructive fraudulent transfers", the fact finder must find that the trustee has proven all of the elements by a preponderance of the evidence with respect to the transfers at issue as to the transferee, meaning that the greater weight of admitted evidence supports the trustee's case against the transferee defendant.  See Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.), 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010) (analysis under the Bankruptcy Code).  In this context, "fraudulent" does not mean that the fact finder must find actual fraud or deceit upon the debtor or defendant transferee.

The trustee must prove the following elements with respect to each transfer that she seeks to avoid as constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code, sections 273 to 275 of the NYDCL, or sections 4(a)(2), or 5(a) or (b) of the NYUVTA[43]:

First: The debtor transferred money or property to the defendant transferee.

Second: The money or property was received by the defendant transferee within two (2) years of the bankruptcy petition date under the Bankruptcy Code, four (4) years of the bankruptcy petition date under the NYUVTA (applicable for transfers after April 4, 2020), or six (6) years of the bankruptcy petition date under the NYDCL (applicable for transfers on or before April 4, 2020), except under certain circumstances discussed in Section

---

[43] Note that a significant statutory distinction between the Bankruptcy Code and state law under both the NYDCL NYUVTA is that under state law, the trustee is required to prove the existence of a creditor who existed at the time the subject transfer was made and whose debt remains outstanding as of the bankruptcy petition date, in order to assert a claim.  The Bankruptcy Code imposes no such requirement upon the trustee although the applicable lookback period is significantly shorter.

IV(C)(i) of the Report below.

Third:  The debtor received less than a reasonably equivalent value (or fair consideration in the case of the NYDCL) in exchange for such transfer or obligation.

Fourth: When the debtor made the transfer it:

    (a)      was insolvent or became insolvent as a result;

    (b)      was left with unreasonably small capital;

    (c)      intended to incur debts beyond the debtor's ability to pay; *or*

    (d)      made such transfer to or for the benefit of an insider under an employment contract and outside the ordinary course of business.

11 U.S.C. § 548(a)(1)(B); NYUVTA §§ 4(b)(2) and (5)(a) and (b); NYDCL §§ 273-275 (note that subsection (d) does not exist in the NYDCL, but the NYDCL incorporates a lack of "good faith" requirement that does not exist under the Bankruptcy Code or NYUVTA).

Under the Bankruptcy Code and NYUVTA, in order to determine whether the debtor received reasonably equivalent value, the fact finder must analyze the particular transaction and compare what was given with what was received.  While a dollar-for-dollar transaction is not required, the consideration cannot be disproportionately smaller than the value of the transferred property.  Lippes v. Bairnco Corp., 249 F. Supp. 2d 357, 377 (S.D.N.Y. 2003) (citing Musso v. Herman (In re Tesmetges), 85 BR 683, 697 (Bankr. E.D.N.Y. 1988)).

In the context of a constructive fraudulent conveyance claim under the NYDCL, which uses the term "fair consideration" as opposed to the term "reasonably equivalent value" found in the Bankruptcy Code and NYUVTA, the term "fair consideration" is often used interchangeably with "reasonably equivalent value."  Official Committee of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.), 524 B.R. 536, 550 (Bankr. S.D.N.Y. 2015).

Under the NYDCL, fair consideration is given for property, or obligation:

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

NYDCL § 272.

Thus, fair consideration has two elements: (1) the exchange of fair value; and (2) good faith. See Silverman v. Sound Around, Inc., 404 B.R. 710, 716 (Bankr. E.D.N.Y. 2009). The focus of the inquiry into fair value is on the value of the specific transaction at issue, *i.e.*, the *quid pro quo* exchange between the debtor and the defendant transferee.

Good faith means that the party receiving the transfer acted honestly, fairly, and openly. Sardis v. Frankel, 113 A.D.3d 135, 143, 978 N.Y.S.2d 135, 142 (1st Dep't 2014). A party may be acting in bad faith when it does not honestly believe that the actions it is taking are proper, if it intends to take unfair advantage of others, or if it knows or intends that the actions will hinder, delay, or defraud others.

### ii. Recovery of Preferential Transfers

Section 547(b) of the Bankruptcy Code enables the trustee to avoid "preferential" transfers of the debtor's property that were made shortly before the filing of the bankruptcy. The purpose of the provision is to preserve a financially distressed debtor's estate to enable the fair distribution of the debtor's assets to all creditors as opposed to those who are favored.

To avoid a preferential transfer, the trustee must prove: (1) there was a transfer of the debtor's property, (2) to or for the benefit of the transferee defendant; (3) on account of an

antecedent debt; (4) made while the debtor was insolvent; (5) made within 90 days preceding the filing of the bankruptcy or, if made to an "insider" when within a year preceding the filing; and (6) the transfer enabled the defendant transferee to receive more than she would have if she received the property in a chapter 7 distribution. 11 U.S.C. § 547(b); see also Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 342 (Bankr. S.D.N.Y. 1999).

Section 101(31) of the Bankruptcy Code defines an "insider" of a company to include, among others, an officer of the company and a relative of a general partner, director, officer or person in control of the company. 11 U.S.C. § 101(31).

### iii.    *Damages in Connection with Breach of Fiduciary Duties*

A manager in a limited liability company owes the company and fellow members a duty of care and a duty of loyalty. Signature Apparel Grp. v. Laurita, Case. No. 09-15378 (RG), Adversary No. 11-02800 (RG), 2015 WL 1009452, at *10 (Bankr. S.D.N.Y. March 4, 2015); Friedman v. Wahrsager, 848 F. Supp. 2d 278, 288 (E.D.N.Y. 2012), quoting RSL Communs. PLC v. Bildirici, Case No. 04-cv-5217, 2006 WL 2689869 (S.D.N.Y. 2006) ("Directors and officers typically owe fiduciary duties to the corporation and its shareholders, which include a 'duty of care' and a 'duty of loyalty.'"); see also Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 442 (S.D.N.Y. 2006).

For the duty of care, a manager must perform his duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances. Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 264 (2d Cir. 1984). The primary element of a fiduciary's duty of care is to make informed decisions while availing herself of expert advice and carefully considering her options. New York Limited Liability Company Act ("NYLLCL") § 409.

The duty of loyalty is the prohibition against self-dealing. <u>Norlin Corp. v. Rooney, Pace, Inc.,</u> 744 F.2d 255, 264 (2d Cir 1984). Self-dealing occurs when a party stands on both sides of a transaction. A member who is not a manager does not owe a duty to the company or its members except to the extent she participates in the management of the company. <u>Id.</u>; <u>Kelly v. Blum,</u> Civil Action No. 4516-VCP, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010).

To establish a breach of fiduciary duty, the trustee must demonstrate (1) the existence of a fiduciary relationship, (2) misconduct on the part of the fiduciary, and (3) damages directly caused by the fiduciary's misconduct. <u>Soley v. Wasserman,</u> 823 F. Supp. 2d 221, 232 (S.D.N.Y. 2011).

The business judgment rule bars judicial inquiry into actions of managers of a limited liability company taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. <u>Auerbach v. Bennett,</u> 47 N.Y.2d 619, 631, 419 N.Y.S.2d 920 (1979). The business judgment rule creates a presumption that the managers acted in good faith and in the best interests of the company. <u>Patrick v. Allen,</u> 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005). However, such a presumption only exists if the managers possess a disinterested independence and do not stand in a dual relationship which prevents an unprejudicial exercise of judgment, and thus, is not applicable when the manager is accused of breaching her duty of loyalty. When a manager has an interest in a decision, the business judgment rule does not apply. <u>Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc. (In re Croton River Club, Inc)</u>, 52 F.3d 41, 44 (2d Cir. 1995); <u>Treadway Cos., Inc. v. Care Corp.,</u> 638 F.2d 357, 382 (2d Cir. 1980).

The trustee has the initial burden of demonstrating that the fiduciary had an interest in a particular transaction. <u>Id.</u> However, if the trustee has proven by a preponderance of the evidence that the fiduciary was interested in a transaction, the burden will shift to the fiduciary to demonstrate the propriety of the transaction at issue. <u>Id.</u> <u>accord</u> <u>Norlin Corp. v. Rooney, Pace Inc.,</u>

744 F.2d 255, 265 (2d Cir. 1984); <u>Minstart Acquiring Corp. v. AMF Inc.</u>, 621 F. Supp. 1252, 1260 (S.D.N.Y. 1985) ("When directors use corporate powers to preserve their control, they become interested directors and have the burden of proving the fairness and propriety of the challenged transaction."). A manager is interested in a transaction if she either: (1) stands on both sides of the transaction, or (2) expects to receive a personal financial benefit from the transaction.

When seeking compensatory damages, the trustee is required to establish that the breach of fiduciary duty was both a "but for" and a proximate cause of the damages. <u>Soley v. Wasserman</u>, 823 F. Supp. 2d 221, 232 (S.D.N.Y. 2011). However, the trustee does not need to establish that the breach was the only "but for" cause of the damages. <u>In re Marine Risks, Inc.</u>, 441 B.R. 181, 204 (Bankr. E.D.N.Y. 2010). It is enough to find cause based on one single factor, which, standing alone, would have caused the injuries sustained by the debtor. <u>In re Marine Risks, Inc.</u>, 441 B.R. 181, 204 (Bankr. E.D.N.Y. 2010).

The calculation of damages in a breach of fiduciary case is dependent upon the type of misconduct in which the fiduciary engaged. <u>Fed. Ins. Co. v. Mertz</u>, 12-cv-1597-NSR-JCM, 2016 WL 164618, at *7 (S.D.N.Y. Jan. 12, 2016) ("The Court reserves judgment on the appropriate measure of damages, which will depend on the determinations made at trial as to the nature of the parties' relationship and the nature of the wrongs…."). In addition to actual damages, punitive damages may be awarded when the particular wrong was aggravated by recklessness or willfulness, whether or not the actions were directed against the public at large. <u>Roy Export Co. Establishment of Vaduz v. CBS, Inc.</u>, 672 F.2d 1095, 1106 (2d Cir. 1982), <u>cert. denied</u>, 459 U.S. 826 (1982). As opposed to compensatory damages, punitive damages are meant solely to punish the offender and deter similar conduct on the part of others. <u>Zurich Ins. Co. v Shearson Lehman Hutton, Inc.</u>, 84 N.Y.2d 309, 316, 618 N.Y.S.2d 609, 612 (1994).

### C. Analysis of Claims for Avoidance of Fraudulent Transfers

#### i.    Gating Issue #1 – Three-Year Lookback Imposed by NYLLCL § 508(c)

There is an important potential temporal limitation imposed upon any Estate Claims seeking the recovery of transfers made to or for the benefit of Mr. Fareri or his spouse on account of their membership interests in Kensington.  As discussed at length above, there are a number of limiting lookback periods with respect to the recovery of fraudulent transfers depending on the statute under which recovery is sought or the timing of the transfer.  Those limiting lookback periods range from two years prior to the Petition Date under the Bankruptcy Code to six years from the Petition Date under the NYDCL.  However, there is another important limitation that is quite possibly applicable to the transfers at issue.

Section 508(c) of the NYLLCL states that a transfer of an otherwise wrongful distribution from a limited liability company to its member is subject to a three-year statute of limitations.  The term "wrongful" includes distributions that can be recovered as either constructive or actual fraudulent conveyances under the NYDCL or a distribution that is based on an alleged breach of the company's operating agreement.  In re Vivaro Corp., 524 B.R. at 548; Geron v. Craig (In re Direct Access Partners, LLC), 602 B.R. 495, 517-18 (Bankr. S.D.N.Y. 2019); O'Connell v. Shallo (In re Die Fliedermaus LLC), 323 B.R. 101, 108 (Bankr. S.D.N.Y. 2005).  The term "distribution," as defined by the NYLLCL, means the transfer of property by a limited liability company to one or more of its members in his or her capacity as a member.

If this limitation applies, it would put a majority of the transfers made to Mr. Fareri (or his spouse) out of reach by a trustee of the Estate under any legal theory since most occurred prior to May 14, 2018, the beginning of the three-year lookback period.  Critically, Mr. Fareri received not less than $12 million in distributions in just the three-week period leading up to May 14, 2018.

Thus, had Kensington filed its bankruptcy petition on April 30, 2021, instead of May 14, 2021, there would be no question that an additional $10 million in transfers would be potentially recoverable as Estate Claims. The Examiner has no indication whether the aforementioned timing issue was merely fortuitous for Mr. Fareri or a result of strategic planning, but the result is the same. The Examiner suspects that the timing of Kensington's bankruptcy filing was merely a reaction to Mr. Carnicelli's attempt to enter a judgment against Kensington based upon the Arbitration Award and that the statutory limitation on Estate Claims is just good fortune for Mr. Fareri. Unfortunately for creditors, the reason would not matter.

If this three-year limitation is applied, the maximum amount of the transfers made to Mr. Fareri (or his spouse) that can be recovered as fraudulent transfers or having been made in breach of fiduciary duties is reduced drastically from approximately $49,248,608.18[44] (gross) or $21,399,752.32[45] (net), to only $8,507,498.81 (gross) or $2,817,126.51 (net).[46] However, recent discussion by the courts warrants an extensive analysis of this limitation and its application.

The three-year limitation imposed by NYLLCL § 508(c) has been the accepted law of the land by most practitioners practicing before this Court at least since it was first discussed at length by Judge Gropper in <u>Die Fliedermaus</u> in 2005, eleven (11) years after the enactment of the NYLLCL. <u>See</u> <u>Die Fliedermaus</u>, 323 B.R. at 108-9. Admittedly, two of the attorneys working on this Report have accepted the basic premise that a bankruptcy trustee is stuck with the three-year

---

[44] This number comports to the Debtor's own books and records. Upon review, the Examiner came up with a slightly higher number of $50,340,620.81.

[45] This number comports to the Debtor's own books and records. Upon review, the Examiner came up with a slightly lower number of $19,905,988.85.

[46] Note that the amount of gross and net transfers in the three-year period prior to the Petition Date is disputed as set forth in detail in <u>Exhibits Q</u> and <u>R</u>. <u>Exhibit Q</u> is a chart prepared by Kensington setting forth its disagreements with the Examiner's characterization of certain transactions. <u>Exhibit R</u> is a document prepared by the Examiner setting forth the disagreements and facts supporting a finding on either side of the dispute. According to Kensington, the actual amount of transfers during that period is $6,732,956.08 (gross) or $249,550.40 (net).

limitation on LLC membership distributions in prior cases, while aggressively arguing around it in different ways.  See e.g., Direct Access, 602 B.R. at 517-18 (Kathleen Aiello at Fox Rothschild LLP representing plaintiff trustee Yann Geron seeking the recovery of certain transfers by the debtor LLC); and Messer v. Magee (In re FKF 3, LLC), Case No. 13-cv-3601 (JCM), Dkt. 39 (S.D.N.Y. Oct. 20, 2017) (Fred Stevens at KWJS&S representing plaintiff trustee Gregory Messer stipulating to the limited lookback period).  However, recent decisions by this Court, the District Court, and the First Department, distinguish the LLC or other members thereof seeking the recovery of wrongful distributions, from a creditor asserting its own rights against a member of the LLC under the NYDCL.  As discussed at length below, this issue requires further exploration and clarification by the courts.[47]

To understand the issue, the Examiner first explores Judge Gropper's decision in Die Fliedermaus, which is in the Examiner's opinion the decision that best addresses the specific situation that exists here.  There, the bankruptcy trustee sought to avoid wrongful distributions made by the debtor, a New York LLC, to its members more than three years prior to the petition date under the NYDCL using the standing afforded under section 544(b) of the Bankruptcy Code.  Die Fliedermaus, 323 B.R. at 105.  Judge Gropper was asked to determine, among other things, whether the bankruptcy trustee was limited to the three-year limitation under the NYLLCL.  Id.

First, Judge Gropper looked at the language of NYLLCL § 508(c), which states that a "member who receives a wrongful distribution from a limited liability company shall have no liability under this article or other applicable law for the amount of the distribution after the

---

[47] In response to the Draft Report, Mr. Carnicelli's legal team quickly raised this issue and the Examiner's initial failure to address it.  While the Examiner does not necessarily agree with Mr. Carnicelli's ultimate conclusion on the issue, the Examiner does agree that the issue requires discussion  and that a trustee for the Estate would necessarily seek a legal ruling in order to resolve the same.

expiration of three years from the date of the distribution." Id. at 108 quoting NYLLCL § 508(c) (emphasis added by court). The court noted immediately that "[o]n its face, this provision appears to provide a special limitations or look-back period for any State-based action to recover a 'wrongful distribution' pursuant to § 544(b), whether under the [NY]LLCL or other State law". Id. Judge Gropper reasoned his interpretation as follows:

> Wrongful is a broad term and the common understanding of the term would include distributions that could be recovered as either constructive or intentional fraudulent conveyances under the DCL, or as distributions based on an alleged breach of an LLC operating agreement.

Id.

Second, Judge Gropper explored the language of NYLLCL §§ 508(a) and (b) including a savings clause in § 508(b) that excepted subdivision (c)'s three-year limitation for "any obligation or liability of a member under the operating agreement or other applicable law for the amount of a distribution." Id. quoting NYLLCL § 508(b). Judge Gropper reasoned that by inserting that savings clause, the New York State legislature made clear that if it wanted to accept claims under the NYDCL from the three-year limitation, it would have done so there in the NYLLCL. Id. citing 1 Karon S. Walker, *N.Y. Practice Series-Limited Liab. Co. & Partnerships: A guide to Law and Practice* § 7:11 ("A member who knowingly receives a wrongful distribution is not liable to the LLC or to creditors after three years from the date of distribution.").

Finally, Judge Gropper concluded that the bankruptcy trustee's claims under the NYDCL were limited to the three-year limit imposed by NYLLCL § 508(c), and that it was the clear intention of the New York State legislature to have done so. Id. at 109. In Williamson v. Culbro Corp. Pension Fund, 41 A.D.3d 229, 232, 838 N.Y.S. 2d 524, 527 (1st Dept. 2007), the First Department analyzed this Court's decision in Die Fliedermaus at length when asked to apply a similar limitation under New York Partnership law and agreed with the holding and Judge

Gropper's reasoning. Id. ("It is hard to imagine how [language in New York Partnership Law §121-607(b) identical to NYLLCL § 508(c)] can mean anything other than that a limited partner's liability for distributions 'under a partnership agreement or other applicable law' is subject to the three-year statute of limitations.")

While various litigants and courts worked around aspects of this Court's decision in Die Fliedermaus, for ten (10) years no court challenged its basic premise that the New York State legislature intended to limit any claims to recover wrongful distributions to an LLC's members to three years. Then in 2015, the district court was asked to determine whether the § 508(c) limitation applied to a creditor of the LLC's claim in In re Lyman Commerce Solutions, Inc. v. Lung, No. 12 CIV. 4398 TPG, 2015 WL 1808693, at *5 (S.D.N.Y. Apr. 20, 2015) (Griesa, J.). There, the district court found that NYLLCL § 508(c)'s limitation did not apply because the recipient of the alleged wrongful distribution was in fact not a member of the LLC. However, Judge Griesa continued in dicta that he believed that confining creditors to the three-year limitation as opposed to the longer statute for claims under the NYDCL was absurd, stating as follows:

> Second, even if the Gilbert defendants may be "members" of [the LLC] as defined in Section 508 [of NYLLCL], the court does not accept the argument that the three-year limitations period in Section 508 is meant to displace the six-year period specified in the CPLR for fraudulent conveyance claims of outside creditors. Section 508, by it terms applies to amounts owed by a member to "the limited liability company" –not to outside creditors. To hold that outside creditors are subject to Section 508's limitations period when bringing claims for fraudulent conveyances to corporate members would be to hold that fraudulent transfers to a corporate insider could be challenged for only half as long as transfers to persons outside the corporate entity. Such a holding would turn the purposes of the fraudulent conveyance statute on its head, which as discussed in more detail below—applies most stringently against transfers to corporate insiders.

Id. (internal citations omitted). Unfortunately, not only were Judge Griesa's comments on the issue in dicta, he did not discuss the detailed decision of this Court in Die Fliedermaus, which methodically explained why it concluded the intent of the New York legislature in limiting not just

47

member's claims to recover wrongful distributions under NYLLCL § 508, but also creditor's, and by implication a bankruptcy trustee's, claims to recover such distributions under the NYDCL.

One year later, in <u>Setters v. AI Properties & Devs. (USA) Corp.</u>, 139 A.D.3d 492, 493, 32 N.Y.S.3d 87, 89 (1st Dept. 2016), the First Department expressly concluded that the three-year limitation imposed by NYLLCL § 508(c) does not override the six-year lookback for a creditor's claim under the NYDCL "since the plain language of section 508 indicates that the statute applies to members of an LLC, holding them 'liable to the limited liability company' for wrongful distributions". <u>Id</u>. quoting NYLLCL § 508(b). Unfortunately, the First Department did not discuss or distinguish this Court's extensive analysis of the statute in <u>Die Fliedermaus</u> or its own acknowledgment, discussion and accord therewith in <u>Williamson v. Culbro</u>.

Recently, in <u>In re Boston Generating LLC</u>, 617 B.R. 442 (Bankr. S.D.N.Y. 2020), <u>aff'd sub nom.</u> <u>Holliday v. Credit Suisse Sec. (USA) LLC</u>, No. 20 CIV. 5404 (GBD), 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021), Judge Grossman was asked to apply Delaware's three-year lookback limitation for LLCs that is nearly identical to NYLLCL § 508(c), to a creditor trustee who stands in the shoes of creditors (as opposed to a bankruptcy trustee who stands in the shoes of the estate, setting aside the special standing afforded to a bankruptcy trustee under section 544(b) of the Bankruptcy Code). <u>Id</u>. at 468. In declining to find that creditors, and by implication the creditor trustee, are bound by the shorter three-year lookback period, Judge Grossman acknowledged this Court's decisions in <u>Direct Access</u> and <u>Die Fliedermaus</u>, and did not expressly disagree with their holdings that the limitation did apply to a bankruptcy trustee. <u>Id</u>. However, Judge Grossman drew a distinction between creditors and a bankruptcy trustee and noted that other courts had done the same with respect to NYLLCL § 508(c). Judge Grossman also drew a distinction for fraudulent transfer claims brought by creditors against a New York LLC's members. <u>Id</u>. citing <u>Lyman</u> 2015

WL 1808693, and <u>Setters v. AI Properties</u>, 139 A.D.3d at 493. While this Court's decision in <u>Boston Generating</u> was affirmed on appeal, the decision on this issue was not one appealed from or discussed by the appellate court. <u>Id</u>.

Unfortunately for a trustee of the Estate here, none of the courts that clearly disagree with this Court's decision in <u>Die Fliedermaus</u>, including this Court in <u>Boston Generating</u>, went into the detail that Judge Gropper did in <u>Die Fliedermaus</u> in determining the intent of the New York State legislature with respect to the limitation. Nor did any of the disagreeing courts discuss the <u>Die Fliedermaus</u> analysis or attempt to distinguish it. <u>Die Fliedermaus</u> is also the only decision that discusses a bankruptcy trustee's rights under the NYDCL by virtue of the standing afforded by section 544(b) of the Bankruptcy Code, as opposed to a creditor's rights under the NYDCL. However, the distinction may be irrelevant because none of the decisions suggest that a bankruptcy trustee's rights afforded under section 544(b) would be different than a creditor's rights. Thus, the ultimate question is whether the <u>Die Fliedermaus</u> line of cases have the correct interpretation of the statue, or whether the <u>Lyman</u> line of cases do.

While the Examiner must agree entirely with the absurdity of the situation that Judge Griesa was focused on in <u>Lyman</u>,[48] the Examiner finds Judge Gropper's detailed interpretation of the statute and legislative intent in <u>Die Fliedermaus</u> persuasive. Regardless, for purposes of this Report, it is clear that application of this three-year limitation is a live issue that will require further discussion and clarification from the courts or alternatively, the legislature.[49]

---

[48] The Examiner feels compelled to note here that he often serves as a bankruptcy trustee and also as a private attorney representing bankruptcy trustees, where he routinely advocates for the most expansive possible view of a trustee's avoidance powers.

[49] The Examiner does note that the State's recent enactment of the NYUVTA would have been an ideal opportunity for the legislature to give clarity on this issue which it declined to do, and thus, courts remain free to interpret the statute as they see fit at least until the legislature acts or there is a controlling decision of a higher court.

These issues are ripe for a clear and consistent ruling and if litigation were pursued, this case may present the perfect opportunity to obtain it. If this issue were resolved in favor of the bankruptcy trustee, it would put, among possibly others, those distributions made to Mr. Fareri immediately following the April 2018 Restructuring in play. Those transfers took place between April 24, 2018 and May 2, 2018 and total not less than <u>$12,250,000</u>.

> ii. **Gating Issue #2 – When did Kensington Become Insolvent, or Have Unreasonably Small Capital?**

The next potential limiting factor with respect to the avoidance of constructive fraudulent transfers is when Kensington became insolvent or possessed unreasonably small capital. This same determination also informs other claims and is a "badge of fraud" for purposes of avoiding actual fraudulent transfers.

Section 101(32) of the Bankruptcy Code defines "insolvent" to mean a situation where the financial condition of an entity is such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors. 11 U.S.C. § 101(32); <u>Tronox Inc. v. Kerr McGee Corp. (in re Tronox Inc.)</u>, 503 B.R. 239, 296 (Bankr. S.D.N.Y. 2013) ("The analysis of solvency for fraudulent conveyance purposes is a 'balance sheet test,' examining whether debts in the aggregate are greater than assets in the aggregate.") (internal citation omitted).

As an alternative to insolvency, the trustee can also meet her financial condition burden to avoid constructive fraudulent transfer under the "capital adequacy" test by demonstrating that a debtor engaged in a transaction "for which any property remaining with the debtor was an unreasonably small capital. . . ." 11 U.S.C. §548(a)(1)(ii)(II). Unreasonably small capital typically refers to the "inability to generate sufficient profits to sustain operations," which is a condition that naturally "must precede an inability to pay obligations as they come due," and as such,

"unreasonably small capital" is a term that "would seem to encompass financial difficulties short of equitable insolvency." In re Lyondell Chemical Co., 567 B.R. 55, 109 (Bankr. S.D.N.Y. 2017), citing In re Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992).

In order to determine the adequacy of capital, financial experts may consider factors such as a company's debt-to-equity ratio, its historical capital cushion, and its need for working capital in the specific industry. One should also consider a company's ability to account for difficulties that are likely to arise or that are reasonably foreseeable. Id. at 1073.

To begin, in order to determine with a reasonable degree of certainty when Kensington became insolvent or was left with unreasonably small capital, the Examiner reviewed Kensington's assets on particular dates. The Examiner also decided to value the unsold condominium units at the values such units were ultimately sold for or the value ascribed to them by Kensington on its bankruptcy schedules. For practical reasons, including consideration of cost versus benefit and the rather short schedule for his Investigation and reporting obligations, the Examiner did not employ an appraiser or other third-party valuation expert to analyze and value the condominium units at each of the relevant dates or a financial advisor to perform the analysis. For purposes of solvency considerations and because Kensington habitually dissipated cash almost immediately upon receipt in order to pay down any secured indebtedness or mortgage loans and make distributions to Mr. Fareri, the Examiner also assumed that the amount of cash Kensington held at any given time was relatively nominal to the extent that he could not determine with precision the amount of cash Kensington had on any particular day. As Mr. Sheskier put it, "any opportunity you had to pull money out of an account, out of a project you do. Why leave money sitting in there during the development of a project[?]". Transcript Jan. 5, 2022, p.97, LL.2-6.

One important factor for purposes of the solvency analysis was when the Development

Claim was actually incurred by Kensington. The most aggressive position for the trustee on behalf of the Estate to take would be that it was incurred on May 5, 2014, the date that Contract 2 was dated.[50] The most aggressive position for a defendant transferee to take would be that it was incurred on March 9, 2018, the date that Contract 2 was signed.[51] The Examiner believes that the most appropriate point to conclude that the obligation accrued was in or around September 2017 when the 2016 BTC Request that contained the site preparation costs embodied in Contract 2 was submitted to NYS TAX under penalty of perjury.[52] Regardless, given that both dates take place prior to the April 2018 Restructuring and the large distributions that immediately followed, the difference between September 2017 and March 9, 2018 is not really material.

Perhaps the most critical factor in determining Kensington's solvency and capitalization was the April 2018 restructuring of its construction loan and distributions to Mr. Fareri that immediately followed. Prior to that restructuring, Kensington appeared to be at least balance sheet solvent even while carrying the obligation to Development based upon Contract 2. However, in April 2018, Kensington closed on a restructuring of its original construction loan with Sterling which had a balance of approximately $17,936,754.35 (the "April 2018 Restructuring"). For some

---

[50] The Examiner also notes that there is good evidence that Kensington was actively formulating the amounts ultimately found in the 2016 BTC Request and Contract 2 almost immediately after the December 2016 issuance of the COC. Among other things, Mr. Carnicelli produced an email dated January 28, 2017 addressed to him and copying Mr. Sheskier among others, from Joseph Moukattaf, an expert employed by Kensington and/or Development to derive the most appropriate charges that could or should have been charged by Development to Kensington for its construction services. The ostensible purpose of the expert's retention would seem to be focused on maximizing the value of Mr. Fareri's BTCs. However, the Examiner does not believe that the act of contract formulation and intent to enter into a contract is sufficient to establish the existence of a liability for purposes of determining solvency. A copy of that email is included as Exhibit N to the Report.

[51] Note that both dates being considered occur before the May 14, 2018 cutoff for recovery of wrongful distributions to Mr. Fareri, and thus, are not significantly relevant for purposes of recovering otherwise wrongful distributions to Mr. Fareri prior to that date. The Examiner also assumes that while a defendant transferee would like to argue that the Development Claim was not incurred until issuance of the Arbitration Award, such an argument would require completely ignoring the the well-founded reasoning of the arbitrators for reaching the Arbitration Award, which the Examiner sees no basis to do.

[52] None of the relevant documents were dated. However, the various constituents appear to agree that the submission was made to NYS TAX in or around September 10 to 15, 2017, just ahead of the relevant tax filing deadline.

period leading up to the April 2018 Restructuring, Sterling began placing the portion of the proceeds from closed condominium units that would ordinarily be disbursed to Kensington into an escrow account. As far as the Examiner can surmise, Sterling was escrowing proceeds as a form of repayment assurance because it was concerned with the slowdown in condominium closings.[53] At the time of the April 2018 Restructuring, Sterling was holding approximately $15,704,928.81 of Kensington's sale proceeds in an escrow (the "Sterling Escrow").

The April 2018 Restructuring resulted in the following:

(i)     Sterling and Kensington agreed to a restructured secured mortgage loan with principal indebtedness of $14,626,500 secured by specific remaining condominium units; and

(ii)    Sterling as Escrow Agent made the following disbursements from the Sterling Escrow:

a.   $3,310,254.35 to itself to pay down the outstanding indebtedness and reduce it from the construction loan with a $17,936,754.35 principal balance to a mortgage with a $14,626,500 principal balance;

b.   $65,690.12 on account of closing costs associated with the restructuring; and

c.   $12,328,984.34 to Kensington ($10,000,000 to The First Bank of Greenwich account and $2,328,984.34 to the Sterling account).

Within eight (8) days of the receipt of the $12,328,984.34 from the Sterling Escrow, Kensington distributed over $12 million to Mr. Fareri (again, the Examiner notes that this was

---

[53] The relationship between Sterling and Kensington appears to have been somewhat strained and there is potentially some disagreement between Sterling and Kensington regarding this escrow and the precise reason for its creation. The Examiner sees no reason to explore the details of the Sterling/Kensington relationship further for purposes of the Report.

accomplished just a couple weeks prior to the three-year lookback limitation imposed by NYLLCL § 508(c) depending on whether it is applicable), and over $1.5 million to affiliate GPSC. In the Examiner's view, the April 2018 Restructuring and subsequent distributions were the pivotal events that rendered Kensington insolvent or otherwise having unreasonably small capital.[54] After that point, Kensington had insufficient asset value to pay its indebtedness (namely the Development Claim), and was undercapitalized and routinely needed capital infusions from Mr. Fareri and/or loans from affiliated entities in order to operate.

Included as <u>Exhibit O</u> to the Report is the Examiner's analysis of Kensington's financial condition before and after the April 2018 Restructuring. Based upon his analysis, the Examiner concludes that the Debtor clearly became insolvent and undercapitalized as a result of the April 2018 Restructuring and distributions that immediately followed. Simply looking at Kensington's internal accounting of its members' capital account based upon its tax returns confirms that insolvency and/or undercapitalization occurred solidly within 2018. A year-by-year comparison of Kensington's members' capital accounts is included as <u>Exhibit P</u>. At the end of 2017, total capital accounts were valued at a positive $1,165,283, but by the end of 2018 the same capital accounts were deeply negative ($4,528,983) on account of the oversized distributions taken immediately following the April 2018 Restructuring. While internal and tax accounting of capital accounts does not definitively prove insolvency or undercapitalization, it does provide a strong litmus test.[55]

---

[54] Sterling raised a concern about the Examiner's questioning of the April 2018 Restructuring as a pivotal event that rendered Kensington insolvent. To be clear, it was not the restructuring of Sterling's loan in and of itself that rendered Kensington insolvent, but it was the restructuring of the loan that granted Kensington access to over $12 million which Kensington almost immediately distributed to its member. It was the distributions that occurred as a result of the April 2018 Restructuring that rendered Kensington insolvent.

[55] In response to the Draft Report, Kensington created and produced to the Examiner a "WORKING CAPITAL ANALYSIS – September 2017 to August 2018" which management argues "establishes solvency under both the working capital and equity criteria for the time periods included." A copy of Kensington's analysis is included as <u>Exhibit S</u> to the Report. The Examiner has reviewed the submission in detail but sees no reason to adjust or question

The Examiner notes that a trustee for the Estate could also very well make the argument that Kensington was undercapitalized from a much earlier date. By Kensington's own accounting[56], it employed a practice of distributing nearly all liquid capital upon receipt to Mr. Fareri even though it was reasonably foreseeable that future capital would be required to fund construction and Kensington's other cash needs. There appears to have been no attempt by Kensington, at any point in time, to retain sufficient capital in order to fund future operations. The justification for this cash management approach for Kensington was its ready access to capital from Mr. Fareri and other Fareri Companies whenever it needed it to pay its obligations, so there was absolutely no practical need to do any forecasting from the Kensington equity level. That is, until entry of the Arbitration Award, Mr. Fareri could always be counted on to inject sufficient funds into Kensington to ensure that it met its obligations. Again, while this manner of resource management is not wrongful generally, such a practice is susceptible to criticism when a creditor is harmed by it.

Kensington's own failure to create projections to assess its capital adequacy is in and of itself damning on the issue. Courts begin the analysis of capital adequacy by reviewing the

---

his conclusion that Kensington was solvent prior to the April 2018 Restructuring and was insolvent after the restructuring and resulting $12+ million in distributions made immediately after. The Examiner appreciates that he conducted his analysis without the assistance of a financial advisor and that any reviewing financial advisor may well make adjustments to the Examiner's solvency analysis. The Examiner also appreciates that a retained expert for Mr. Fareri would likely take issue with the Examiner's conclusions. However, the Examiner has seen absolutely nothing that makes him question the basic common-sense conclusion that if Kensington were liquidated on or before April 23, 2018, it would be able to satisfy its debts, but if it were liquidated on or after May 3, 2018, it could not. (Note that the Examiner used May 14, 2018 date in the solvency analysis because it mirrored the three-year anniversary of the bankruptcy filing, but that the transfers that rendered Kensington clearly insolvent were made on May 2, 2018).

[56] Included as Exhibit L is a spreadsheet produced by Kensington showing the numerous inflows and outflows of Kensington's resources from and to Mr. Fareri and Fareri Companies. Included as Exhibit M is the Examiner's independent analysis of capital transfers between Mr. Fareri or other Fareri Companies and Kensington. Following receipt of the Draft Report, Kensington requested certain adjustments to the capital flows between Kensington and Mr. Fareri identified by the Examiner during the three-year period prior to the Petition Date. Kensington's requested adjustments and basis therefore is included as Exhibit Q, and the Examiner's analysis of those requested adjustments is included as Exhibit R.

debtor's management's projections.  See In re Iridium Operating LLC, 373 B.R. 283, 347 (Bankr. S.D.N.Y. 2007) ("Without a firm basis to replace management's cost projections with those developed for litigation, the starting point for a solvency analysis should be management's projections."); see also MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Svcs. Co., 910 F.Supp. 913, 944 (Bankr. S.D.N.Y. 1995) (stating that for capital adequacy, "a court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made").

The problem here is that there is nothing for a court to review because Kensington never made any written projections at any point in time.  The only projections available are from Mr. Sheskier's memory which he freely admits are of little use:

> Q.      Well, I am just trying to understand if at the time of making those distributions, the distribution [to Mr. Fareri] on April 26[th] of 2018, if anyone sat down and tried to figure out if there was going to be enough money in Gateway Kensington's account to manage cash flow.
>
> A.      I would have to say that I - - I did not look at it from that point of view, so. . .
>
> Q.      Is that something you typically would do at that point in time?
>
> A.      Well, that's a tough call because in some cases it's really just - - you know, am I remiss in my duties?  Sometimes as far as sitting down as far as mapping things out, yes, I have to say that I am remiss on doing some of the due diligence that my title - - that my title would indicate that I would be doing.
>       Unfortunately when I lost the comptroller at the end of '16, I ended up wearing two hats; I am the comptroller and the CFO.  And like some people, you sometimes get caught up on the day-to-day operations and I am not expending as much of my effort on the - - what would normally be a true CFO thing, which is looking at cash flow all the time as to what's going on.  So I can't say, you know, that I did it. . . .
>
> Q.      Is that something that you should have done?
>
> A.      Should I have done it - - well, in retrospect it's something I should have done at the point in time.

Sheskier Transcript, Jan. 5, 2022, pp.103-105. Given that management admits that it failed to assess Kensington's capital requirements when determining whether to distribute funds to Mr. Fareri, and Kensington's books and records demonstrate that it routinely made distributions to Mr. Fareri even when it would foreseeably require contributions, it strains credibility to suggest that Kensington did not have unreasonably small capital at least as of the April 2018 Restructuring and large distributions made immediately following it.[57]

Thus, the Examiner concludes that Kensington was both insolvent and undercapitalized as a result of the April 2018 Restructuring and resulting distributions and that it remained that way through to the present day. Further, the Examiner concludes that Kensington was generally undercapitalized since it was deemed to have incurred the Development Claim in September 2017.

### iii. Gating Issue #3 – Are BTCs Transfers by Kensington That Can be Recovered?

One of the specific enumerated duties of the Examiner was to investigate the BTCs and whether Mr. Fareri's receipt of their financial benefit constitutes a recoverable transfer. Mr. Carnicelli's legal team is adamant that Mr. Fareri's receipt of value from the BTCs amount to constructively fraudulent transfers by Kensington. Mr. Fareri's legal team is equally adamant that they are not. The issue is far more complicated than it seems at first blush. The Examiner has

---

[57] Following circulation of the Draft Report which contained the foregoing analysis, the Debtor sought to clarify and correct the record with respect to the alleged failure by management to create projections and assess Kensington's future cash needs prior to making distributions to Mr. Fareri. On January 20, 2022, Kensington provided an analysis created as of December 20, 2017 of rental income and expenses for the twelve (12) units ultimately granted to Sterling as collateral on its mortgage loan following the April 2018 Restructuring. A copy of that analysis is included as Exhibit T to the Report. The Examiner does not believe that these projections address the issue or warrant changing the Examiner's conclusions for at least the following reasons: (i) the projections are isolated to the cash flow associated only with the twelve (12) units offered to Sterling as collateral and not Kensington's operation as a whole; and (ii) the projections were created four months before the April 2018 Restructuring and resulting distributions, which was the point in time relevant to the inquiry. The fact remains that Kensington never considered its future cash needs when making distributions to Mr. Fareri, and never prepared any analysis or projections showing the cash needs of its entire operation.

invested meaningful effort in attempting to answer the question because of the specific attention and focus that this issue was given by the parties, the UST, and the Court in the Examiner Order. As explained further below, the Examiner is not able to conclude whether such a claim would survive dispositive motion practice based on the anticipated argument that the Estate lacks standing. Assuming that standing is found to exist based upon a sufficient interest by Kensington in the BTCs during relevant periods, the Examiner is likewise unable to pinpoint the amount of recoverable value given the uncertainty as to the relevant date of transfers of such interests.

As a starting point and as identified previously, the BTCs at issue have a collective value of approximately $11 million[58] as follows:

(i) <u>Site Preparation/Remediation BTC</u> – Following an application and audit process, Mr. Fareri received $6,284,540 from NYS TAX on August 8, 2018 on account of Kensington's site preparation and remediation BTC.[59]

(ii) <u>2017 Tangible Property BTC</u> – Following a lengthy application and audit process, Mr. Fareri received $2,668,482.13 from NYS TAX on September 10, 2020 on account of Kensington's tangible property BTC for expenses paid in 2017.

(iii) <u>2018 Tangible Property BTC</u> – Mr. Sheskier has informed the Examiner that there are other tangible property BTCs available for expenditures made in 2018 that will be applied for in 2022 and which he values at approximately $2 million.

---

[58] Mr. Farerei and his spouse might argue that the actual value of the benefits derived by the BTCs should be net of Federal income tax. <u>See generally</u> <u>Ginsburg v. United States</u>, 136 Fed. Cl. 1 (2018) (determining that refund of BTC by New York is subject to federal taxation as income).

[59] It was the Examiner's understanding that Mr. and Mrs. Fareri applied for acceptance into the State's tax amnesty program with respect to this BTC in an attempt to return all or a portion of it and avoid any negative legal consequences of having submitted the application. However, certain documents were produced to the Examiner on January 4, 2022 indicating that the request had been withdrawn on May 28, 2021, fourteen (14) days after the Petition Date, and that the taxpayers intended to retain the payment.

In order for any of the value received by Mr. Fareri on account of the BTCs to be potentially recoverable by Kensington as a fraudulent transfer, Kensington must have had an interest in the BTCs at some relevant point in time.  Prudential standing requires that the trustee (or any plaintiff) assert her own rights and interests and not those of third parties.  <u>Warth v. Seldin</u>, 422 U.S. 490, 499, 95 S. Ct. 2197 (1975). Though at first blush the answer may seem obvious given that Kensington's name was on both the 2016 BTC Request and the 2017 BTC Request (collectively with any future BTC requests submitted by Kensington, the "<u>BTC Requests</u>") as the holder of the COC associated with the Project, upon further legal analysis, the legal interest of Kensington in the BTCs and its resulting standing to assert a claim for avoidance and recovery becomes far less clear.  Indeed, the Examiner believes that Mr. Fareri and his spouse are likely to move to dismiss any cause of action filed by the Estate seeking to avoid and recover the value of BTCs on the basis of, among other things, a lack of legal standing in light of the pass-through nature of Kensington and based upon the nature of BTCs as a non-transferable tax attribute.  As a result, this determination as to legal standing and what manner of interest of Kensington in the BTCs are necessary to confer such standing, were the initial focus of the Examiner in assessing the relative merits of such an avoidance theory.

Section 541(a) of the Bankruptcy Code broadly defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. §541(a)(1); <u>see also</u> <u>United States v. Whiting Pools, Inc.</u>, 462 U.S. 198, 205 (1983) (noting that scope of section 541(a)(1) is broad and intended to include property made available by other bankruptcy code provisions, including property in which debtor lacked possessory interest as of commencement).  "At the same time, 'the estate succeeds to no more interest than the debtor had, and the estate takes its interest subject to the conditions under which

the debtor held an interest.'" In re S.Side House, LLC, 474 B.R. 391, 402 (Bankr. E.D.N.Y. 2012), (quoting Kipp v. Depoy (In re Depoy), 29 B.R. 466, 469 (Bankr. N.D.Ind. 1983)); see also In re Sanders, 969 F. 2d 591, 593 (7th Cir. 1992) (noting that filing bankruptcy does not expand or change debtor's interest in property and bankruptcy trustee takes property subject to same restrictions that existed as of petition date). "Property in which the debtor holds only legal title and not an equitable interest, however, becomes property of the estate 'only to the extent of a debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold'". 11 U.S.C. § 541(d). "The legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title." United States v. Whiting Pools, 462 U.S. at 204, n8 (1983).

Generally, a bankruptcy court looks to applicable state law to determine a debtor's interest in property. See Butner v. United States, 440 U.S. 48, 56 (1979) ("Congress has generally left the determination of property rights in the assets of a bankruptcy's estate to state law"). "The nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law." In re Prudential Lines Inc., 928 F.2d 565, 569 (2d Cir. 1991). "Although federal bankruptcy law determines the outer boundary of what may constitute property of the estate, state law determines the 'nature of a debtor's interest' in a given item." In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1101 (2d Cir. 1990) (quoting In re Howard's Appliance Corp., 874 F.2d 88, 93 (2d Cir. 1989)). Federal courts have long recognized the ability of consolidated taxpayers to freely adjust among themselves their tax liability under state corporate law. In re Bob Richards Chrysler-Plymouth Corp., Inc., 473 F.2d 262, 264 (9th Cir. 1973), abrogated by Rodriguez v. Fed. Deposit Ins. Corp., 140 S. Ct. 713, 206 L. Ed. 2d 62 (2020). However, when considering the extent of

property interests in a tax asset like a BTC, the Examiner struggled with what law should guide the inquiry. Indeed, courts have often struggled with the interplay between tax and bankruptcy law and how to properly view issues of standing and property rights in tax attributes. See Prudential Lines, 928 F.2d at 573 (holding that right to carryforward NOL was property of bankruptcy estate); see also Guinn v. Lines (In re Trans-Lines West, Inc.), 203 B.R. 653, 660 (determining that trustee lacks standing to challenge validity of debtor's prepetition revocation of subchapter S status, but that same revocation amounts to transfer of interest in property of debtor); Webster v. Mooney (In re Mooney), 526 B.R. 421, 424 (Bankr. M.D. Ga. 2015) (noting circuit split in relation to whether and to what extent tax credits are property of estate).

Bankruptcy courts in this district have looked to Second Circuit precedent in determining the proper body of appliable non-bankruptcy law to apply to a property interest determination in tax assets. In re Marciano, 372 B.R. 211, 214-15 (Bankr. S.D.N.Y. 2007) (relying on Musso v. Ostashko, 468 F.3d 99 (2d Cir. 2006) in utilizing Section 236 of NY Domestic Relations Law to conclude that interest of non-debtor spouse in property did not completely vest until after bankruptcy petition was filed and therefore property in question remained part of the bankruptcy estate). Other bankruptcy courts have looked to Supreme Court precedent when considering what portion of an individual debtor's tax refund should be considered property of the estate. See In re Trickett, 391 B.R. 657 (Bankr. D. Mass. 2008) (analyzing Supreme Court precedent in the context of determining property of the estate interest in joint tax asset between debtor and non-debtor spouse). "[I]n Segal v. Rochelle, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), the Court noted that '(i)t is impossible to give any categorical definition to the word 'property' nor can we attach to it in certain relations the limitations which would be attached to it in others.'" Kokoszka v. Belford, 417 U.S. 642, 646 (1974) (quoting Segal v. Rochelle, 382 U.S. at 376).

Unfortunately, the Examiner has been unable to find any decision where a reviewing court has analyzed precisely the situation present here. Moreover, neither the Bankruptcy Code nor the Internal Revenue Code ("IRC") definitively answer the inquiry, although the Examiner believes certain provisions of each shed some light on the subject matter. For instance, the IRC provides that partners of partnerships (or members of limited liability companies treated as partnerships for tax purposes) are liable for taxes of the pass-through entities they own and not the entities themselves. See 26 U.S.C.A. § 701 ("A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities."). The IRC further establishes that in bankruptcy cases of corporations or partnerships, "no separate taxable entity shall result from the commencement of a case under Title 11 of the United States Code." 26 U.S.C. § 1399; see also In re L.J. O'Neill Shoe Co., 64 F.3d 1146, 1151 (8th Cir. 1995) (no separate taxable entity results from commencement of bankruptcy by corporation). Section 346(c) of the Bankruptcy Code also specifically recognizes the pass-through nature of partnership tax attributes and makes clear that a partnership debtor will not be obligated to pay any tax imposed on its partners or members. 11 U.S.C. § 346(c). To the Examiner, this relevant statutory recognition of the continuing pass-through nature of these types of entities after entering bankruptcy is relevant when considering what may otherwise be diverging views on the extent of property interests in the BTCs that follow. So unless applicable state law would provide otherwise, the Examiner concludes that the federal statutory scheme contemplates a recognition of this pass-through nature of partnerships even after they enter bankruptcy.

As stated previously, Kensington is a limited liability company organized under the laws of the State of New York. Based upon the tax returns of Kensington provided to the Examiner,

Kensington has always been a pass-through entity for tax purposes and has opted for treatment as a partnership during all relevant tax periods. Moreover, and pursuant Article VIII of its Operating Agreement, Mr. Fareri, as manager, is able to make any tax election for Kensington that he chooses. Mr. Fareri, and not Kensington, has control over Kensington's tax status.[60]

When it comes to an entity's tax classification, the Examiner has concluded that New York State law follows the Federal designation. Specifically, NYS TAX's Publication 16 entitled "New York Tax Status of Limited Liability Companies and Limited Liability Partnerships" makes clear that New York tax law follows federal tax law in terms of entity classification. See NYS TAX Publication 16 (11/14), p. 5, which states:

> The New York personal income tax and the corporate franchise tax conform to the federal income tax classification of LLCs and LLPs. Accordingly, an LLC or LLP that is treated as a partnership for federal income tax purposes will be treated as a partnership for New York tax purposes. An LLC or LLP that is treated as a corporation, including an S corporation, for federal income tax purposes will be treated as a corporation for New York tax purposes or as a New York S corporation if the New York S election is made.

In light of the pass-through nature of Kensington that is recognized by both Federal and applicable state tax laws, what interest in the BTCs, if any, did Kensington acquire and when, if at all, could Kensington first be argued to have obtained a fully vested interest in the BTCs? To properly consider what rights Kensington possessed in relation to the BTCs, the Examiner was required to consider the legal nature of a BTC. As the MM Report informs us, a BTC is a refundable tax credit available to qualifying taxpayers and created by New York statutory law. N.Y.Tax Law § 21. Such statute defines the parameters of the entitlement to certain qualifying taxpayers and imposes limitations on the extent of such credit. Until fully vested, the BTC is

---

[60] The Operating Agreement likewise provides that Kensington shall keep its accounting records in the same method as Mr. Fareri and the fiscal and tax years of Kensington shall be the same as Mr. Fareri's. Mr. Fareri also agreed to make timely payments to any taxing authority with jurisdiction over his income and interest as a member.

nothing more than an expectancy interest. Empire Gen Holdings, Inc. v. Governor of State, 40 Misc. 3d 984, 989, 967 N.Y.S.2d 919, 923 (Sup. Ct. 2013) quoting Novara ex rel. Jones v. Cantor Fitzgerald, LP, 20 A.D. 3d 103, 108, 795 N.Y.S.2d 133 (3d Dept. 2005). A BTC becomes fully vested when all of the requirements of Section 21 of the Tax Law have been met. Id.

Through his research, the Examiner has found the reasoning applied by the Third Circuit in Majestic Star Casino to be the most appealing in consideration of these issues of property interests in tax attributes and associated standing. In that decision, the Third Circuit was asked to consider whether a debtor subsidiary had standing to challenge the revocation of its flow-through tax status by the parent company and ultimately whether that debtor's bankruptcy estate had a property interest in such tax status. In re Majestic Star Casino, LLC, 716 F. 3d 736, 747 (3d Cir. 2013). In order to determine standing, the Circuit Court first focused on the question of "whether a debtor subsidiary's entity tax status is 'property' at all, and if so, whether it is property belonging to that subsidiary or to its non-debtor corporate parent." Id. at 748. After considering relevant authority, the Third Circuit concluded that the IRC, rather than state law, "governs the characterization of entity tax status as a property interest for purposes of the Bankruptcy Code." In reversing the Delaware Bankruptcy Court's decision, the Third Circuit in Majestic Star Casino went on to find that the debtor entity's "S-Corp Status", i.e., its pass-through tax status, is not property of that entity. Id. at 758. This decision critiqued and declined to follow the bankruptcy court decision In re Trans-Lines West, Inc., and later decisions that followed it and which analogized certain net operating loss carryforward attempts by debtors or non-debtors to an S-Corp debtor's pass-through tax status. 203 B.R. 653 (Bankr. E.D. Tenn. 1996).

The Examiner believes that the analysis employed by the Third Circuit to consider and deny standing to the subsidiary debtor due to a lack of property interest in such debtor's tax status

and find that it was instead controlled by the shareholder parent, is analogous to Kensington's interests in the BTC, or lack thereof, as a New York limited liability company that elected partnership tax treatment. Here, since New York law and the IRC seem to be consistent, there appears to be no controversy in recognizing the pass-through nature of Kensington for purposes of this standing assessment.

In light of the foregoing, the Examiner believes that the best way to view the rights of Kensington in relation to the BTCs is that for all relevant periods it possessed merely a contingent interest and that such contingency was controlled by Mr. Fareri. If Mr. Fareri as the managing member, determined to alter the tax entity status of Kensington to that of a corporation during the relevant prepetition period, then Kensington might have been entitled to the BTCs and their attendant value. If instead the tax entity status remained unchanged, as the record here established, the Examiner thinks that the better view is that Kensington was not able to capture the BTCs' value given that it is treated as a partnership and does not pay separate tax from Mr. Fareri and his spouse. In the Examiner's view then, such contingent interest by Kensington during relevant prepetition periods never amounted to an interest sufficient to provide standing to Kensington in order to sue for any improper utilization or otherwise avoid a theoretical transfer of the BTC to Mr. Fareri or his spouse.

Although the Examiner believes that the Third Circuit's decision in Majestic Star is well-reasoned and provides guidance on this point of standing, it must also be acknowledged that this decision is not directly on point, nor is it binding on a court in this district. Moreover, there is contrary non-binding authority as mentioned hereinabove. Given the lack of clear authority in the Second Circuit on this point and in the context of a motion to dismiss based upon lack of standing, the reviewing court would be forced to reconcile the foregoing statutes and decisions and

ultimately weigh the different policies at play. In light of the somewhat inconclusive application of the law on these facts, the Examiner decided to go further and seek guidance from a legal advisor with significant experience with BTCs to help him better understand the nature of a BTC and how transactions involving BTCs are completed in New York. For this he retained Mintzer Mauch. Their analysis identified certain additional limitations to extracting value by Kensington on account of the BTCs as explained further herein.

Somewhat to his surprise, the Examiner was advised by Mintzer Mauch that a BTC is simply not freely transferable in New York. What that means is that there is no practical means by which Kensington might have transferred the same for value to a third party in order to generate funds to pay creditors. This limitation that exists in New York can be contrasted with laws in other states like Massachusetts which expressly permit the sale of BTCs once the amount of the credit has been determined by the state taxing entity. New York simply has no such provision. Further, a BTC is only valuable to a taxpayer that actually incurred eligible costs for the BTC. Therefore, as of the end of 2016, only Kensington (and its ultimate taxpayer) could apply for the BTC based on permitted expenditures incurred prior to the conclusion of 2016. Given the pass-through nature of Kensington, which entity was treated as a partnership for both federal and New York state tax purposes during 2016, Kensington was simply unable to capture the tax credit. Rather, only the members of Kensington could realize the benefit of the associated BTC earned by such date. Thus, if Kensington sold the Project on January 1, 2017, it could transfer the COC to a new owner for value, but not the entitlement to BTCs for expenditures that it made prior to the sale. Under this hypothetical, the new owner would be entitled to apply for BTCs based on the preexisting BCA and COC, but only for the new owner's qualified expenditures going forward. Overall then, at any point in time when Kensington might have sought to sell the Project and COC, the accrued value

of the BTC based on qualified expenditures up to that point could not be transferred to or realized by a third party.

Together with Mintzer Mauch, the Examiner has struggled to find a realistic scenario whereby Kensington (as opposed to its members) might have captured or realized the value of the BTCs during periods of its undercapitalization or insolvency to satisfy creditors. In all instances, a voluntary act by Mr. Fareri as manger or member of Kensington appears necessary. As stated above, Mr. Fareri might have elected to change the tax status of Kensington to that of a corporation and thereby capture the value of the BTCs at Kensington's level as a corporate taxpayer, but the Examiner has identified no case or law that would require Mr. Fareri to alter that entity tax status under such circumstances.[61] Mr. Fareri may also have elected to contribute the net value of the BTCs as capital to Kensington. However, again, the Examiner is not aware of any legal obligation that would compel such an infusion of capital under these circumstances. The only identified transaction scenario where the accrued value could be realized on account of the BTCs in the marketplace involves a hypothetical sale by the Fareris of their membership interests in Kensington. If such a hypothetical sale took place on or after January 1, 2017 and prior to the application and allowance process for the pre-2017 BTCs, Kensington and/or its new owners (depending on the new owners' tax election) could claim the pre-2017 BTC. However, such a hypothetical transaction does little for the instant inquiry because the value to be realized by that sale is never captured at the Kensington level. The Fareris' membership interests in Kensington belong to the Fareris and not to Kensington or its Estate. An analysis at this level would only be relevant for the trustee of a hypothetical bankruptcy estate of the Fareris. After more closely

---

[61] Certainly, the Operating Agreement for Kensington does not so require and probably insulates Mr. Fareri from any argument of breach of duty based on his not having done so.

examining the nature of BTCs and the transferability under New York state law, the Examiner is still left with the conclusion that Kensington's entity structure and partnership tax treatment combine to create a practical roadblock to its capture of value from the BTCs without a voluntary act by Mr. Fareri.

The Examiner also considered other relevant hypotheticals. For example, the Examiner considered what would happen if Kensington filed a bankruptcy petition on January 1, 2017. Even then, the bankruptcy trustee would have no right or power to change Kensington's pass-through tax status or claim the pre-2017 BTCs. The trustee may for practical purposes be able to extract some value because the Fareris would need such a trustee to cooperate in the submission of the 2016 BTC Request and responses to the standard audit of such request by NYS TAX, but that cooperation is a ministerial act and the value for such act would simply be whatever the trustee was able to extract and would most likely be immaterial in the Examiner's judgment.

Notwithstanding the foregoing analysis as to the merely contingent property interests of Kensington and the arguments as to the Estate's lack of standing, the Examiner recognizes that there are alternative arguments that can and will be made if a global resolution on all the Estate Claims is not achieved. Certainly, a trustee for the Estate may well argue that the reasoning of the Third Circuit in Majestic Casino is misplaced and that the Trans-Lines West court and many decisions that follow it, are more persuasive and consistent with a broad view of the bankruptcy estate. Indeed, even contingent interests in property have been determined to be property of the estate. See Segal, 382 U.S. at 379 ("[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed."); see also Prudential Lines, 928 F.2d at 572 ("In short, interests whose value is speculative and interests that involve intangible rights that are subject to regulation may be

included as property of the estate."). The Examiner is not dismissive of these positions and believes that they will combine to provide meaningful challenges to any court that is caused to decide these questions of property interest and legal standing. Under these facts and circumstances, the Examiner cannot rule out the possibility that a sufficient interest in the BTCs by Kensington may be found to provide adequate standing for an Estate trustee to proceed.

If Kensington were found to have sufficient contingent interest in the BTCs to grant it standing to sue, other challenges to a successful recovery of value by the Estate nonetheless remain. Specifically, the Examiner focused on certain temporal questions and issues when attempting to determine the first point at which Kensington might have acquired an interest in the BTCs and at what point a transfer for bankruptcy purposes might have occurred. As set forth in the MM Report, BTCs start to accrue upon signing of a BCA, though issuance of a COC by NYS DEC is a prerequisite to eligibility for any tax credit and ultimately, a BTC cannot be claimed until the COC is issued and the tax year concludes. MM Report, p.2.

On the one hand, if the pass-through nature of Kensington results in any property interest it acquires in BTCs to pass automatically by operation of law to Mr. Fareri and his spouse, then it might be argued that those interests were transferred by Kensington to Mr. Fareri and his spouse beginning as early as 2014 following entry into the BCA when such interests started to accrue thereafter as each eligible expense was incurred on the Project. On the other hand, if no interest in a BTC is fully vested until the COC is issued and the tax year concludes, then the earliest point at which a transfer by Kensington to Mr. Fareri occurred might be viewed as January 1, 2017 following conclusion of 2016 tax year for Kensington and Mr. and Mrs. Fareri. Yet another possibility might be that no transfer of value occurred to Mr. Fareri and his spouse until tax returns and associated BTC Requests were filed, i.e., September 2017 and September 2018 (and according

69

to Mr. Sheskier, September 2022 when Kensington and/or the Fareris intend to apply for a tangible property BTC for the 2018 year). Finally, the latest potential point in time for such a transfer of value to have occurred on account of the BTCs would seem to be the date that payments of refunds were actually made to Mr. Fareri and his spouse by NYS TAX, i.e., August 8, 2018 and later.

Depending upon which of the foregoing transfer date viewpoints is adopted, the corresponding maximum recoverable value based upon a constructive fraudulent transfer avoidance theory will be directly impacted. Under the earliest transfer date viewpoint, a majority of the interests and value of the BTCs in question would have transferred prior to September 2017 when the Examiner believes that Kensington was first undercapitalized and when a creditor exists to afford a trustee sanding, and most definitely before the April 2018 Restructuring when Kensington was rendered insolvent. Further, under such scenario, they would occur before the three-year lookback period for the recovery of wrongful distributions to Kensington's members. As the applicable transfer date moves later in the time continuum, more transfers and more value become theoretically recoverable as they fall beyond the identified dates of undercapitalization and insolvency of Kensington. In the Examiners view, the earlier transfer date viewpoint is the most appealing under the circumstances here since it is consistent with the pass-through nature of Kensington and takes the broadest view of both "property" and "transfer". However, the Examiner freely admits that different conclusions may well be drawn on this point and that there is no clear legal conclusion to be drawn on these facts.

The Examiner also gave some consideration to whether alternative theories of recovery might lie against Mr. Fareri and his spouse on account of their receipt of value from the BTCs, including avoidance of actual fraudulent transfer and unjust enrichment. The Examiner does not feel that the factual record sets forth any clear support for an Estate Claim for avoidance of actual

fraudulent transfer of the value associated with the BTCs. Importantly and in the same manner as a constructive fraud claim, such a claim is subject to a motion to dismiss for lack of standing based upon insufficient property interest in the BTCs. Hypothetically speaking, to assert that an actual fraudulent transfer occurred on the instant facts would require establishing that Mr. Fareri knowingly caused Kensington to misrepresent actual costs incurred to New York state when it submitted BTC Requests and that such knowing misrepresentation amounted to actual intent to hinder, defraud, or delay a creditor of Kensington. If NYS TAX was found to be a creditor at the point in time of the applicable transfer dates and if the Estate could sufficiently plead that Mr. Fareri approved or otherwise controlled submission of the BTC Requests, then a colorable claim for actual fraudulent transfer may lie. Again, the Examiner does not believe that the record is conclusive on these allegations. As such, the Examiner puts very little value in a theoretical claim for the avoidance of actual fraudulent transfer against Mr. Fareri or his spouse even assuming you could successfully deal with the standing issue.

The Examiner also gave some consideration to a potential claim against Mr. Fareri and his spouse based upon a theory of unjust enrichment. In New York, the elements of an unjust enrichment claim are that (1) defendant received a benefit or was enriched, (2) at the plaintiff's expense, and (3) that equity and good conscience require restitution. Beth Israel Med. Ctr. V. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F. 3d 573, 586 (2d. Cir. 2006). The appeal of such a theory for the Estate is that it is not subject to the same legal standing argument that avoidance actions are subject to here. However, the Examiner does believe that defenses by Mr. Fareri and his spouse would likely include, among other things, that a valid written contract, in the form of the Operating Agreement, governs the tax treatment and entitlements of Kensington and its members and that such a claim for unjust enrichment cannot be sustained where a written

contract governs these points. Id. at 587 ("the existence of a valid and enforceable written contract governing a particular subject matter ordinarily preludes recovery for events arising out of the same subject matter"). Further, Mr. Fareri and his spouse would likely argue successfully that Kensington was not induced, nor did it rely upon Mr. Fareri or his spouse, in relation to Mr. Fareri's receipt of value as member of Kensington. Rather, the Operating Agreement and all tax determinations were in place well before any BTC even came into existence. For the foregoing reasons, the Examiner does not believe that these alternative theories of recovery are likely to yield substantially better odds of recovery than the constructive fraudulent transfer theory espoused by Mr. Carnicelli.

While the Examiner believes that there are significant defenses and limitations in relation to a trustee successfully pursuing Estate Claims on account of the value received from BTCs by Mr. Fareri and his spouse, he cannot completely foreclose the possibility of success either. As such, he believes it is reasonably likely (significantly greater than 50%) that a court would determine that the Estate lacks standing to pursue avoidance and recovery of the value of the BTCs. However, if such a claim survived a motion to dismiss, the worst-case scenario for Mr. Fareri and his spouse in terms of potential damages may be the entire value of the BTCs up to the amount necessary to fill any Estate Shortfall. The Examiner believes that a worst-case scenario outcome is also unlikely (less than 50%) due to significant unresolved questions and legal issues concerning the applicable transfer date to Mr. Fareri and his spouse of any BTC benefits and the relative recoverable value transferred during periods of undercapitalization or insolvency by Kensington. On the whole, the Examiner believes that there is some settlement value for the Estate and corresponding incentive for Mr. Fareri to resolve these potential Estate Claims based on the value he and his spouse received from the BTCs.

### iv. *Gating Issue #4 – Is Mr. Fareri Entitled to Any Credit for Capital Contributions Made to Kensington <u>After</u> Receipt of Otherwise Improper Distributions?*

During the three-year lookback period provided for under NYLLCL § 508(c) (between May 14, 2018 to May 14, 2021), Kensington made between $6,732,956.08 and $8,507,498.81 in distributions to Mr. Fareri personally. <u>See</u> <u>Exhibits Q</u> and <u>R</u> for outline and discussion of factual disputes regarding amount of gross distributions during the time period. As set forth in Section IV(C)(ii) *supra*, the Examiner believes that Kensington was insolvent and/or had unreasonably small capital during that entire period. Accordingly, in the Examiner's view, any distributions made during the three-year lookback period are avoidable as constructively fraudulent. However, during that same period, Mr. Fareri recorded between $5,690,372.30 and $6,483,405.38 in contributions or advances to Kensington as part of what the Examiner identified above as a free flow of capital between Kensington and its owner without taking Kensington's future capital needs into consideration. Accordingly, the question here is whether Mr. Fareri is entitled to an offset defense and credit for his contributions as against the distributions he received during the three-year lookback period. If so, such an offset would potentially reduce Mr. Fareri's exposure on this particular claim for the three-year period preceding the Petition Date from the gross amount of the distributions to potentially as low as a range of between $249,550.40 (as Kensington contents) and $2,817,126.51 (as identified by the Examiner).

Generally, a transferee may present a credible defense to a fraudulent transfer claim where the subject transfers were made in exchange for "reasonably equivalent value" and in good faith under the Bankruptcy Code, or "fair consideration" under the NYDCL which includes a good faith

requirement in the definition of "fair consideration."[62]  If Mr. Fareri were not an insider, he would very likely be entitled to this complete offset defense.  However, Mr. Fareri's "insider" status as the managing member and ninety-nine (99%) percent interest holder of Kensington, creates a strong impediment to his chances of successfully claiming the offset defense under both federal and state law.

As a general rule, "the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property" (without regard to the transferee's good faith), Sharp, 403 F.3d at 54 (quoting Pashaian v. Eccelston Props., 88 F.3d 77, 85 (2d Cir. 1996)); however, there is an exception to this rule where "the transferee is an officer, director, or major shareholder of the transferor" Sharp, at 54 (quoting Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 249 (2d Cir. 1987); citing HBE Leasing I, 48 F.3d at 634.  A number of federal and state court decisions "have held that a transfer made to a director, officer or shareholder when an entity is insolvent is not made in "good faith" even if it is in repayment of a valid debt, because it does not constitute "good faith" for an insider to receive a preference over other creditors." Jalbert v. Flom, et al. (In re BICOM NY, LLC), 633 B.R. 25, 42 & 45 (Bankr. S.D.N.Y. 2021) (finding that a transferee's status as a shareholder is sufficient to satisfy the presumption that the transfer is not in good faith

---

[62] Under the Bankruptcy Code, good faith transferees are "a transferee or obligee of such transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c).  Under New York law, a transfer is made without "fair consideration": (a) when in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) when such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained." NYSCL § 272. A transfer for fair consideration is one that is made in exchange for both "a fair equivalent" and "in good faith". Allen Morris Commercial Real Estate Srvcs. Co. v. Numismatic Collectors Guild, Inc., 1993 WL 183771 at *9 (S.D.N.Y. May 27, 1993); see e.g., Remo Drug Corp. v. Sheik, No. CV-89-0508, 1990 WL 82820, at *1 (E.D.N.Y. June 12, 1990); Farm Stores, Inc. v. School Feeding Corp., 477 N.Y.S.2d 374, 378 (2d Dep't 1984) aff'd, 64 N.Y.2d 1065 (1985); Southern Industries, 411 N.Y.S.2d at 948-49.

and "fair consideration" is lacking; actual day-to-day operation control is not required; provided that the transferor is insolvent at the time of the transfers); <u>citing</u> <u>Allen Morris</u>, 1993 WL at *9.

Under New York law, "transfers from an insolvent corporation to an officer, director or major shareholder of that corporation are *per se* violative of the good faith requirement of NYDCL § 272 and the fact that the transfer may have been made for a fair equivalent is irrelevant." <u>Hirsch v. Gersten (In re Centennial Textiles)</u>, 220 B.R. 165, 172 (Bankr. S.D.N.Y. 1998) (emphasis supplied); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>HBE Leasing I</u>, 48 F.3d at 634 ("New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration."); <u>Atlanta Shipping</u>, 818 F.2d at 249 (2d Cir. 1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."); <u>Checkmate Comms.</u>, 9 B.R. at 617 ("Good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer…or because of a transferee's position as an insider with control over the corporation's finances."); <u>Southern Industries, Inc. v. Jeremias</u>, 66 A.D.2d 178, 411 N.Y.S.2d 945, 949 (2d Dep't 1978) (finding transfer "void for lack of good faith because it was consummated with the intent to obtain an unconscionable advantage for one, who is an officer, director and major stockholder of the corporation over the rights of other general creditors). The court in <u>Southern Industries</u> explained "it is an abuse of an insider's control of a company's affairs for the insider knowingly to take a preference over other creditors, and under New York law such a knowing preference precludes a finding of good faith. <u>Geron v. Craig, et al. (In re Direct Access Partners, LLC)</u>, 602 B.R. 495, 555 (Bankr. S.D.N.Y. 2019); <u>citing</u> <u>Southern Industries</u>, 411 N.Y.S.2d at 949.

Regarding good faith, courts have held that transfers from an insolvent corporation to an officer, director and major shareholder of that corporation are *per se* violative of the good faith requirement of NYDCL § 272. <u>Remo Drug Corp. v. Sheik</u>, 1990 WL 82820, at *1 (<u>citing</u> <u>Southern Industries</u>, 411 N.Y.S.2s at 948-50). "[W]hen an insolvent corporation transfers property to one who is an officer, director and major shareholder, the fact that the transfer may have been made for a 'fair equivalent' is irrelevant. Such a transfer is irrefutably presumed to be fraudulent for purposes of Section 273." <u>Id.</u>; <u>see also</u> <u>Atlanta Shipping Corp. v. Chemical Bank</u>, 818 F.2d at 249; <u>Southern Industries</u>, 411 N.Y.S.2d at 948-50; <u>Farm Stores</u>, 477 N.Y.S.2d at 378.

Mr. Fareri's "insider" status precludes his designation as a "good faith transferee" entitled to credit against the transfers for his contributions to Kensington. Kensington was insolvent at the time of the subject transfers, owing obligations to, at a minimum, Development and Sterling. In fact, shortly before the three-year recovery period commenced, Kensington, by and through Mr. Fareri, applied for and was granted a loan from Sterling and continued to solicit advances and contributions from other Fareri Companies to fund Kensington's operating deficiencies. Kensington's operating deficiencies existed in large part because Kensington never took into account its future capital requirements prior to making distributions to Mr. Fareri knowing that it could draw on Mr. Fareri whenever necessary. Notwithstanding general undercapitalization, Kensington, by and through Mr. Fareri, continued to distribute between $6.7 and $8.5 million to Mr. Fareri during the three-year period preceding the Petition Date.

It is worth noting that this Court in <u>Direct Access Partners</u> drew a distinction between an insider transferee's *knowing* receipt of a preference with some level of knowledge or awareness of the transferor's insolvency and an insider transferee's receipt of payment they reasonably believed to be proper. The Court acknowledged that insiders have not acted in good faith where they have

abused corporate powers to confer a benefit upon himself or herself, but that good faith should not be automatically negated simply because the transferee is an insider and acted without any knowledge or intent. "Under New York law a transferee normally lacks "good faith" if the transferee (i) lacked an honest belief in the propriety of the activities in question; (ii) intended to take unconscionable advantage of others; or (iii) intended to hinder, delay, or defraud others (or knew that the activities in question would do so). Direct Access Partners, 602 B.R. at 556; citing Am. Federated Title Corp. v. GFI Mgmt. Servs. Inc., NO. 13-6437, 2016 WL 4290525, at *4 (S.D.N.Y. Aug. 11, 2016). "An insider who intentionally takes a preference may thereby 'intend[] to take unconscionable advantage of others." But if such "intent" is lacking it is difficult to see why a "good faith" defense would be automatically and inflexibly barred. Id.

Mr. Fareri's status as an insider automatically renders the availability of this defense difficult although certainly not impossible. In order to succeed in asserting the offset defense, Mr. Fareri would have to prove that Kensington was not insolvent at the time of receiving any distribution at issue (a difficult if not impossible task in the Examiner's view following the April 2018 Restructuring and $12+ million in distributions that immediately followed) or that he could not conceivably have had any knowledge of Kensington's finances or Kensington's intent to prefer him over creditors. While Mr. Fareri seems genuinely ignorant of the specifics of Kensington's finances as he typically deferred to Mr. Sheskier on such issues, it may be very difficult for him to escape knowledge of what is a clear and consistent practice of Kensington of distributing any and all available funds to himself regardless of Kensington's financial condition and future capital needs. As Mr. Sheskier said, "any opportunity you had to pull money out of an account, out of a project you do", "why leave money sitting in there during the development of a project[?]"

(Transcript, Jan. 5, 2022, p.97, LL.2-6) and "[h]istorically if we needed money, we would request a capital call from John [Fareri]." Id. p.100, LL.19-21).

Kensington historically distributed any and all excess funds to Mr. Fareri without any concern over its present financial condition or future cash flow or capital needs. It did this because it clearly knew that when it needed capital, Mr. Fareri would put it in, which Mr. Fareri historically did without fail until entry of the Arbitration Award. This fact presents a serious challenge to Mr. Fareri's defense which requires a showing of good faith under both the relevant federal and state statutory framework. The difficulty in proving this defense presents a potentially absurd result for Mr. Fareri. Had Mr. Fareri simply waited to take any distributions during the three-year lookback period until Kensington's cash flow needs were met, he would have only received the net transfers, and thus, that would be all that is at issue. However, since capital freely flowed between Mr. Fareri and Kensington, Mr. Fareri has potential exposure of the total amount of gross transfers, even though the net result to Mr. Fareri is the same in both scenarios. Although that result seems absurd, it is consistent with caselaw and the lesson is clear – a business owner should not be taking distributions even if ready, willing, and able to give money back to the business if needed, if there is reason to believe that the entity will be unable to pay its debts.

The strength of this defense is far from certain, but it is abundantly clear that there is a live issue on a trustee's ability to recover the amount of the distributions made to Mr. Fareri in the three-year lookback period up to the full, gross amount of the transfers without any credit for contributions. If Mr. Fareri failed in asserting this defense, there would be sufficient available recovery based just on the three-year distributions in order to make up the entire Estate Shortfall before consideration of potential recovery of the BTCs, the recovery of wrongful distributions

made prior to the three-year lookback period, or other potential damages related to the April 2018 Restructuring are considered.

        *v.*    **Are Any Claims for Avoidance of Fraudulent Transfers Likely to be Meritorious?**

        **a)**   **Against Mr. Fareri and the Fareri Companies**

Based upon the foregoing, the Examiner concludes as follows with respect to Kensington's claims against Mr. Fareri for the avoidance of fraudulent transfers:

(i)       there is a live question regarding the applicability of NYLLCL's three-year lookback limitation for recovering transfers made to Kensington's members. If applicable, it would shield a majority of the transfers made to Mr. Fareri, including the over-$12 million distributed between April 24 and May 2, 2018. If it did not apply, that same $12 million received by Mr. Fareri would be subject to attack (Gating Issue #1 discussed in Section IV(C)(i) *supra*);

(ii)      Kensington was both insolvent and had unreasonably small capital for the duration of the three-year lookback period and certainly as a result of the April 2018 Restructuring and the distributions to Mr. Fareri that immediately followed, and may have had unreasonably small capital as far back as September 2017 (Gating Issue #2 discussed in Section IV(C)(ii) *supra*);

(iii)     distributions made to Kensington's members while insolvent and undercapitalized and after incurring the Development Claim are avoidable by the trustee as actually and/or constructively fraudulent, or otherwise wrongful under the Operating Agreement and NYLLCL;

(iv)     while the Examiner is unable to make a definitive conclusion on the issue, he does not believe that the trustee will be successful in pursuing a claim to avoid and

recover the value of the BTCs received by Mr. Fareri (Gating Issue #3 discussed in Section IV(C)(iii) *supra*); and

(v)     there is an uncertain chance of success on Mr. Fareri's defense to the avoidance of some of the distributions made during the three-year lookback period on the basis of offset of later contributions (Gating Issue #4 discussed in Section IV(C)(iv) *supra*).

Based on the foregoing, the Examiner concludes that there is a very high likelihood of success in recovering all distributions made by Kensington to Mr. Fareri during the three-year lookback period preceding the Petition Date, subject to reduction if Mr. Fareri successfully asserts a defense of offset for contributions made during the same period.  The Examiner further concludes that the authority related to the legal issue of the applicability of the three-year lookback limitation imposed by NYLLCL § 508(c) to a bankruptcy trustee is inconsistent and ripe for legal challenge.  Any trustee for the Estate would be well-justified in asserting a claim for avoidance of not just the transfers made during the three-year period prior to the Petition Date, but for the $12+ million in transfers made immediately following the April 2018 Restructuring and immediately preceding the three-year lookback period.  It is unclear how any court would rule on the issue and the transferees' inevitable motion to dismiss, but the challenge would be well-founded.

### b)  <u>Against Mr. Carnicelli</u>

The Debtor and/or Mr. Fareri has asserted that Mr. Carnicelli has also received wrongful transfers from Kensington on account of $209,373.04 in improvements made to his personal residence by contractors employed by Development and that were charged to Kensington.  Mr. Carnicelli has generally admitted that he received the services from the contractors (without

approving each line item of the alleged benefit) and stated that this was a common practice in the office and that others have similarly received such services.[63]

The Examiner has identified a number of challenges in successfully prosecuting the alleged claims against Mr. Carnicelli (or Mr. Fareri's daughter or others if they received similar benefits as Mr. Carnicelli contends). To begin, the relevant payments to the contractors did not come directly from Kensington, but rather from Development and which Development then allegedly charged to Kensington. If true, Kensington should be viewed as having overpaid Development for general contracting services. A true-up by way of an adjustment to the Development Claim[64] may well be the most efficient manner of remedying this issue. The Examiner notes that the most appropriate time to have asserted this claim was likely by way of a counterclaim in the Arbitration. However, Kensington withdrew all of its counterclaims against Development in the Arbitration and the disputes involving the contractual relationship between Kensington and Development were litigated to conclusion upon issuance of the Arbitration Award in favor of Development. While the defense of *res judicata* does not apply perfectly because no final judgment has been entered, the dispute between the parties has been practically concluded. Add to this that Mr. Carnicelli will no doubt argue that he provided significant value to Kensington in exchange for whatever he may have received from these construction services, and the Examiner finds it hard to believe that any trustee would engage in this fight for a maximum recovery of just over $200,000, not to say that she would be precluded from trying.

---

[63] Mr. Sheskier stated that at least Mr. Fareri's daughter has received the benefit of work by contractors employed by entities in the Fareri organization on her personal residence.

[64] Kensington in fact timely filed a claim against Development's bankruptcy estate (Claim No. 5-1) in the amount of $828,397.93. However, the review of claims filed against Development's bankruptcy estate is not within the Examiner's charge.

If Mr. Carnicelli and others received inappropriate value from Development, that may very well be an issue that the Development Trustee will raise at an appropriate time. Further, if Mr. Carnicelli or others received material benefits in this manner and did not declare the value thereof as taxable income, it may very well be an issue for the taxing authorities. However, the Examiner does not believe that this is an issue for Kensington's trustee.

### D. Analysis of Claim for Recovery of Preferential Transfers

The Estate has potential insider preference claims against both GPSC and Wescorp, two Fareri Companies. First, the Examiner notes that both Fareri Companies begin to become relevant with respect to Kensington at the end of 2019. Prior to this time, Kensington received capital when needed by and through Mr. Fareri, most often through the infusion of cash. Thus, the transfers were reflected in the chart of Mr. Fareri's capital contributions and distributions even if they originated from a Fareri Company. In late 2019, however, Kensington began engaging in lending and other relationships with other Fareri Companies. As Mr. Sheskier explained, there was a shift in thinking in the Fareri organization at that time to stop putting all capital flow through Mr. Fareri and to have Fareri Companies transact business directly with one another.[65]

---

[65] Mr. Sheskier explained the shift from involving Mr. Fareri in every flow of capital between Fareri Companies and having the Fareri Companies deal directly with on another as follows:

> Q. So that was an institutional change?
> A. Yes, it was a - - just a mindset change of how we were trying to handle the accounting of these things.
> Q. What was the reason for the mindset change?
> A. Well, because - - I don't know. I think John [Fareri] was tired of reaching into his pocket all the time and wanted these companies to try to stand on their own, and we minimized the number of transactions that were being done.
> Q. So did he deliver that mindset change to you and the rest of the staff?
> A. It was probably me more so than him.
> Q. It was you who came up with the mindset change or it was more the staff?
> A. No, I think it was me. . .

Sheskier Transcript, Jan. 5, 2022, pp.82-3.

The Examiner has been charged with determining whether $39,770.42 transferred to Wescorp from June 26, 2020 to September 9, 2020, and $432,713.80 transferred to GPSC on August 17, 2020 are avoidable preferential transfers. The Examiner has concluded that they probably are not avoidable for the following reasons: (i) the Examiner reviewed the outstanding invoices for GPSC and has determined that even if the funds transferred to it were avoidable as preferential, it has a complete "new value" defense under section 547(c)(4) of the Bankruptcy Code; (ii) while he has not reviewed the invoices for Wescorp, the transfers that it received were more than eight months prior to the Petition Date and it still has an outstanding claim that would most likely afford it strong defenses; and (iii) the Examiner believes that other Estate Claims (namely those against Mr. Fareri) should create sufficient value to pay allowed claims in full, and thus, if the Examiner is correct the trustee could not make a prima facie case for avoidance of preferential transfers under section 547(b)(5) of the Bankruptcy Code which requires the recipient to have received more than they would have in a hypothetical chapter 7.

Based upon the foregoing, the Examiner concludes that preference claims against insider Fareri Companies do not warrant further consideration.

### E. Analysis of Claim for Breach of Fiduciary Duties

Given the negative result for creditors of Kensington if the NYLLCL's three-year limit on seeking recovery of wrongful distributions is applicable (remember, if Kensington's bankruptcy case were filed just three weeks earlier, there would be no question that there would be an additional over $12 million in potentially recoverable distributions), the Examiner believes that a trustee for the Estate should give strong consideration to whether any alternative claims for breach of fiduciary duty might lie here. The Examiner is particularly focused on the April 2018 Restructuring, which resulted in, among other things: (i) Kensington maintaining a high level of

secured indebtedness solely to make over $12 million in immediate distributions to Mr. Fareri; and (ii) Kensington being rendered insolvent and undercapitalized. No reasonable business justification supports maintaining such a high level of secured indebtedness at the time of the April 2018 Restructuring. Had the April 2018 Restructuring not occurred, the existing secured indebtedness to Sterling on account of the construction loan would have been reduced to under $3 million and sufficient net asset value would remain in Kensington such that all creditors, including Development, would be paid in full (unless Mr. Fareri took additional distributions as funds flowed in from later condominium closings, but those would have been relatively clearly recoverable by the Estate and within the three-year lookback period if applicable). Accordingly, there is good reason to examine whether Mr. Fareri's committing Kensington to the April 2018 Restructuring is actionable.

The first question is whether Mr. Fareri breached his duty of care to Kensington by committing to the April 2018 Restructuring. This is a difficult proof. In addition to the business judgment rule and other limitations to such claims under New York law, the Operating Agreement imposes sharp limits to such claims. The Operating Agreement clearly authorized Mr. Fareri to enter into a transaction like the April 2018 Restructuring. Operating Agreement, §5.1(l). The Operating Agreement also expressly provided that Mr. Fareri's duty of care in the discharge of his duties to Kensington "is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." Id. at §5.7. Those are very hard standards to meet.

There is one facet of the April 2018 Restructuring that may at least arguably result in a colorable breach of duty of care claim in these circumstances.[66] If Development's claim had

---

[66] The Examiner also considered one other possibility. Mr. Fareri executed a letter of intent with Sterling on March

accrued by September 2017 as the Examiner believes it did, then Development possessed certain trust fund rights with respect to any equity in or proceeds of Kensington's real property under New York lien law which is intended to provide special protection to contractors and parties who improve real property. See New York Lien Law, Article 3-A. Under that theory, Mr. Fareri's taking distributions constituted a conversion of Development's trust funds and amounts to a violation of law. Again, however, there is a serious question about whether Mr. Fareri did so knowingly, especially since he claims to be completely ignorant of the formulation of Contract 2. That said, Mr. Fareri freely admits to having executed Contract 2 in March 2018, one month prior to both the April 2018 Restructuring and the over-$10 million in distributions to him from Kensington. Thus, the Examiner believes it would be challenging for Mr. Fareri to satisfy a fact finder of his ignorance concerning Development's rights following entry into Contract 2. Overall, the Examiner views this breach of the duty of care as at the very least a colorable claim that would survive a motion to dismiss.

The next question is whether Mr. Fareri violated his duty of loyalty in connection with committing Kensington to the April 2018 Restructuring. The restructuring appears to have been accomplished, in large part, to benefit Mr. Fareri who received distributions much sooner than he would under any other circumstances, while at the same time Kensington received little if any recognizable benefit. As an alternative to the April 2018 Restructuring, Kensington might have

---

13, 2018 in connection with seeking the April 2018 Restructuring that stated clearly that the purpose of the loan was to "[p]rovide the financing to refinance the existing construction loan with an approximate balance of $16,000,000 . . . ."[66] At first, the Examiner concluded that this was not the case as only $2.3 million of the amount borrowed appeared to be used to pay off the existing construction loan with the remainder distributed to Mr. Fareri and Fareri Companies. Intentional misrepresentations to a federally insured lending institution would amount to a criminal act under 18 U.S.C. § 1344, giving rise to a breach of duty of care argument even under the stringent protective language of the Operating Agreement. However, upon reviewing discovery from Sterling and examining Mr. Sheskier, the Examiner learned of the previously undisclosed Sterling Escrow which was applied to the existing construction indebtedness. Thus, while the mechanics were confusing, there was no obvious falsehood put forth by Mr. Fareri in connection with the April 2018 Restructuring.

simply left the preexisting construction loan in place, allowed Sterling to draw the Sterling Escrow, and paid off the remaining amount due Sterling in relatively short order. It is worth noting that the Operating Agreement expressly permitted Mr. Fareri to compete with Kensington and transact business with Kensington and did not expressly forbid such activity. Operating Agreement, §5.5. However, given the fact that the transaction clearly harmed Kensington's Estate and its creditors largely to benefit Mr. Fareri, the Examiner believes that this too is a colorable claim.

Mr. Fareri may have a valid defense that the breach of fiduciary duty claims outlined above amount to an end run around the three-year lookback limitation on the recovery of wrongful distributions if it is applicable, but that is a defensive argument and is not clearly applicable in the Examiner's view.

While the equities of attacking the April 2018 Restructuring may favor Kensington's Estate and its creditors, the law and terms of the Operating Agreement create clear hurdles to successful prosecution of such theories. Still, the Examiner believes that challenging the April 2018 Restructuring under these circumstances is a worthwhile exercise by a trustee of the Estate even though the likelihood of success is uncertain.

## V.     ANALYSIS OF INSIDER CLAIMS

The Examiner begins with a review of the contracts or other support underlying the following Insider Claims and then discusses potential theories for limiting surviving claims if appropriate:

| Scheduled or Claim No. | Claim | Relationship of Claimant | Classification | Amount |
|---|---|---|---|---|
| Scheduled | 500WPA Claim | Affiliate | General Unsecured | $600,000.00 |
| Claim No. 5 | Carnicelli Claim | Development Shareholder | General Unsecured | $823,874.80 |

| Scheduled or Claim No. | Claim | Relationship of Claimant | Classification | Amount |
|---|---|---|---|---|
| Claim No. 3 | Development Claim | Affiliate | General Unsecured | $14,333,446.38 |
| Scheduled | GPSC Claim | Affiliate | General Unsecured | $1,088,927.10 |
| Scheduled | Wescorp Claim | Affiliate | General Unsecured | $33,499.14 |

## A. Concept – Recharacterization of Claims to Equity

The Examiner begins with a discussion of the law related to the Court's ability to recharacterize claims to equity. As set forth in detail below, the Examiner believes that this concept is applicable to a number of the Insider Claims and that the Insider Claims should be analyzed with this concept in mind.

Where circumstances permit, courts may recharacterize claims to equity. In determining whether a claim should be properly characterized as equity rather than debt, the question is whether, as a matter of economic reality, the arrangement is a debt or whether it is equity. In re SubMicron Systems, Corp., 432 F3d 448, 456 (3d Cir. 2006); In re Adelphia Comm'ns Corp., Bankr. No. 02-41729, 2006 WL 687153, at 9-10 (Bankr. S.D.N.Y. March 6, 2006).

Courts in this circuit look to the test set forth by the Sixth Circuit in In re AutoStyle Plastics, Inc., 269 F.3d 726 (6th Cir. 2001) in determining whether the parties intended for the investment at issue to be debt rather than equity. In re Live Primary, LLC, 626 B.R. 171, 178 (Bankr. S.D.N.Y. 2021), citing Id. at 747-48. In AutoStyle, the court examined the following eleven factors to determine whether the parties intended for the investment at issue to be debt to equity:

1. the names given to the instruments, if any, evidencing the indebtedness;

2. the presence or absence of a fixed maturity date and schedule of payments;

3. the presence or absence of a fixed rate of interest and interest payments;

4. the source of repayments;

5. the adequacy of capitalization;

6. the identity of interest between the creditor and the stockholder;

7. the security, if any, for the advances;

8. the corporation's ability to obtain financing from outside lending institutions;

9. the extent to which the advances were subordinated to the claims of outside creditors;

10. the extent to which the advances were used to acquire capital assets; and

11. the presence of a sinking fund to provide repayments.

Id.

As set forth in Section C *infra*, the Examiner believes that the Insider Claims except for the Carnicelli Claim in a limited amount and the Development Claim subject to a slight reduction should be recharacterized to equity under the AutoStyle test.

## B. Factual Analysis of Each Insider Claim

### i. *500WPA Claim*

On February 16, 2021, 500WPA deposited $600,000 into Kensington's First Bank of Greenwich account. 500WPA takes the position that this deposit was a loan to Kensington, consistent with what Mr. Sheskier stated was the organization's shift in or around 2020 away from relying upon capital calls from Mr. Fareri when capital was needed. 500WPA and Kensington have booked this transaction as a loan to Kensington. However, there are no written agreements to reflect the term of this purported loan and no interest was charged according to Kensington's books and records, despite Mr. Sheskier's testimony that it carried a 4% interest rate. Shortly after the advance in question, Kensington used the funds to pay debt arising from the Arbitration. Indeed, Kensington produced a schedule identifying seventeen (17) payments totaling of $597,007.17 (the "Arbitration Payments") made after it received the funds advanced by 500WPA.

Of the Arbitration Payments, the Examiner identified only two (2) of those payments, totaling $68,819.32, that flowed through Kensington's bank accounts. Rather, the Examiner learned that Kensington actually transferred $450,000 of the $600,000 purportedly loaned by 500WPA to Mr. Fareri, which Mr. Fareri then claimed to have paid directly to Kensington's counsel in the Arbitration through four (4) wires totaling $450,000. The Examiner asserted that the $450,000 in question is part of the total transfers made to Mr. Fareri that are recoverable by the trustee.

For these reasons and the argument stated below, the Examiner concludes that any remaining 500WPA Claim should likely be recharacterized to equity.

### ii. Mr. Carnicelli Claim

Mr. Carnicelli filed the Carnicelli Claim in the amount of $823,874.80, the amount expended on costs and legal fees in connection with obtaining the Arbitration Award for the benefit of Development. However, this request for costs and legal fees was already asserted and ruled upon in the Arbitration. The arbitrators concluded that the reimbursement sought by the Carnicelli Claim should be pursued against Development, the beneficiary of Mr. Carnicelli's efforts, if at all, and awarded Mr. Carnicelli a claim for reimbursement of out-of-pocket costs associated with the Arbitration in the more limited amount of $104,640.38. Arbitration Award, pp.17-18. Consistent with the arbitrators' decision, Mr. Carnicelli asserted a duplicative claim against Development's estate for his attorneys' fees, which is where that claim should be properly asserted.

Accordingly, the Examiner concludes that the Carnicelli Claim should be reduced and allowed as a general unsecured claim in the amount of $104,640.38 only.

### iii.    Development Claim

The Development Claim qualifies as an Insider Claim which the Examiner is required to review pursuant to his charge in the Examiner Order.  The Examiner sees no reason to disturb the well-reasoned decision of the arbitrators set forth at length in the Arbitration Award.  Accordingly, the Examiner concludes that the Development Claim should be allowed subject to a reduction of $104,640.38 which is duplicative of the Carnicelli Claim, leaving the amount of the allowed Development Claim of $14,228,806.00.

### iv.    GPSC Claim

Kensington scheduled a claim in favor of GPSC for $1,088,927.10 for "Advances for Cash Flow Shortages from an Affiliate".  <u>See</u> Schedule F at 3.5.  Mr. Sheskier informed the Examiner that GPSC is a property management company, of which Mr. Fareri is a majority owner, that is used to pay all the monthly invoices on behalf of Kensington via a GPSC clearing account.  GPSC apparently uses that same account to pay the monthly invoices for more than twenty other Fareri Companies.

The Examiner is not aware of any formal loan agreement, management agreement, promissory note or other documentation that exists between Kensington and GPSC with regard to the entities' debtor-creditor, management, or other purported relationship.  Mr. Fareri testified that intercompany loans are done from time to time, but he could not recall the specifics of the amount of GSPC's alleged loan, whether the loan was authorized, or when the loan was made.  In response to the Examiner's specific request for documents, the Debtor produced a "Due to GPS" ledger with a date range of January 1, 2020 to December 31, 2021.  The ledger was comprised of a series of journal entries related to Kensington showing credits or advances made by GPSC in favor of Kensington which are noted as "Clear out Sweep account balance set total to post into GPS Master

(057)". The Examiner was unable to reconcile the "Due to GPS" ledger with Kensington's bank statements because it appears the money existed solely in the GPSC account and payments were made from that account for Kensington's benefit. According to the "Due to GPS" ledger, GPSC advanced approximately $1,521,640.90 to Kensington between January 1, 2020 and December 31, 2021. During that time, $432,713.80 was returned to GPSC from the proceeds of the sale of Unit 110 of the Project, reducing the balance due to GPSC to $1,088,927.10, the amount of the GPSC Claim.

Because of the limitations on the date range selected for the "Due to GPS" ledger produced to the Examiner, it did not capture three transactions that pre-dated that time-period which are reflected in Kensington's bank statements. Specifically, GPSC advanced $48,000 and $36,000 on December 4, 2017 and January 7, 2019, respectively. Kensington then transferred $1,506,000 to GPSC on April 26, 2018 from the proceeds of the April 2018 Restructuring with Sterling, which Mr. Fareri claimed as a distribution to himself personally on Kensington's 2018 tax return demonstrating a pattern of interchanging Mr. Fareri for a Fareri Company. It appears that any value contributed to or received by GPSC from Kensington was credited to Mr. Fareri until what Mr. Sheskier described as a mindset shift in the last two years to stop doing that.

For these reasons and the argument stated below, the Examiner concludes that any GPSC Claim should likely be recharacterized to equity.

### v. *Wescorp Claim*

Kensington represented on its bankruptcy schedules that it owes $33,499.14 to Wescorp on account of "suppliers or vendors". See Schedule F at 3.14. Mr. Fareri explained that Wescorp is a construction company or contractor, of which he is the president and owner, that essentially performs the same work as Development. In this case, Wescorp began performing warranty work

for Kensington in late 2019, after Mr. Carnicelli's departure from Development and an apparent decision by Mr. Fareri to wind down Development. Warranty work requires contractors to correct any defects through additional work on the project, typically over a specified time period.

According to Mr. Fareri, Development was under contract with Kensington, by and through Contract 2 (or Contract 1 depending on the position taken) to perform warranty work for Kensington, but because Development never did the work as a result of Mr. Fareri deciding to wind it down after Mr. Carnicelli's departure, Kensington had to hire Wescorp to do the warranty work at the Project. Mr. Fareri stated that Wescorp issued bills to Kensington, but that there was no written agreement outside of those bills or invoices. Neither the Debtor nor Mr. Fareri has produced invoices issued by Wescorp to Kensington in support of the Wescorp Claim, so the Examiner could not definitively conclude the validity of the scheduled amount owed to Wescorp. Nevertheless, it appears that even if Kensington hired Wescorp to perform warranty services that were provided for under the agreement between Kensington and Development and the Wescorp Claim is deemed valid, that Kensington would have a right to assert a claim against Development for the amount of Wescorp's claim. The problem with asserting that argument at this point is that the contractual dispute between Kensington and Development was litigated to conclusion in the Arbitration and Kensington clearly and intentionally withdrew its counterclaims against Development in that action. Thus, it is unclear whether and how Kensington could seek recourse against Development for breach of contract.

For the reasons stated below, the Examiner concludes that any remaining Wescorp Claim should likely be recharacterized to equity.

## C.  Recharacterization of the Insider Claims

Based upon consideration of the <u>AutoStyle</u> factors set forth in Section V(A) *supra*, the Examiner believes that the 500WPA Claim, the GPSC and Wescorp Claim should be recharacterized to equity, as follows:

| | CLAIMS | | |
|---|---|---|---|
| **AutoStyle Factor** | **500WPA Claim** | **GSCS Claim** | **Wescorp Claim** |
| the names given to the instruments, if any, evidencing the indebtedness | No instruments | No instruments | No instruments except possible invoices |
| the presence or absence of a fixed maturity date and schedule of payments | No fixed maturity date or schedule of payments | No fixed maturity date or schedule of payments | No fixed maturity date or schedule of payments beyond possible invoice terms |
| the presence or absence of a fixed rate of interest and interest payments | No interest payments and no interest accounted for by Kensington[67] | No fixed rate of interest or interest payments | No fixed rate of interest or interest payments |
| the source of repayments | Not applicable | Repayments were made from Kensington's operations | Repayments were made from Kensington's operations |
| the adequacy of capitalization | Kensington was insolvent and undercapitalized | Kensington was insolvent and undercapitalized | Kensington was insolvent and undercapitalized |
| the identity of interest between the creditor and the stockholder | Kensington and creditor are majority owned by Mr. Fareri | Kensington and creditor are majority owned by Mr. Fareri | Kensington and creditor are majority owned by Mr. Fareri |
| the security, if any, for the advances | Not applicable | Not applicable | Not applicable |
| the corporation's ability to obtain financing from outside lending institutions | Kensington only obtained secured financing in past which did not appear available | Kensington only obtained secured financing in past which did not appear available | Kensington only obtained secured financing in past which did not appear available |

---

[67] Mr. Sheskier stated that 500WPA had excess funds and had started lending them to other Fareri Companies that needed it at an annual interest rate of 4%.  However, there is no instrument that reflects this and Kensington did not reflect the existence or accrual of interest on the 500WPA Claim in its books and records.

| | CLAIMS | | |
|---|---|---|---|
| **AutoStyle Factor** | **500WPA Claim** | **GSCS Claim** | **Wescorp Claim** |
| the extent to which the advances were subordinated to the claims of outside creditors | Outside creditors if any (other than Development) were paid first | Outside creditors if any (other than Development) were paid first | Outside creditors if any (other than Development) were paid first |
| the extent to which the advances were used to acquire capital assets | Not applicable. Funds used to pay costs of Arbitration. | Not applicable. Advances used for operations. | Not applicable. Services were provided by creditor. |
| the presence of a sinking fund to provide repayments | No sinking fund | No sinking fund | No sinking fund |

Based upon the foregoing, the Examiner believes that there is a very strong case for the recharacterization of the 500WPA Claim and the GSCS Claim, and a reasonable case for the recharacterization of the Wescorp Claim. In any event, the Wescorp Claim is small and of little consequence.

## VI.   INVESTIGATIVE CONCLUSIONS

As stated from the outset, the Examiner declines to weigh in on the personal dispute between Messrs. Carnicelli and Fareri. The Examiner's investigative conclusions and identification of colorable Estate Claims are grounded almost entirely in technical statutory law and are informed by the economic realities of the Estate and Estate Shortfall.[68]  For all the reasons set forth at length above, the Examiner concludes as follows:

(i)    while significant, the size of the Estate Shortfall (estimated to be between $5.8 and $8.3 million depending upon the allowance of certain Insider Claims) is relatively modest when considering the costs and delays associated with litigating any Estate Claims to final conclusion and the relative strength of those claims (see Exhibit A,

---

[68] As stated above, if the Examiner is found to have grossly underestimated the Estate Shortfall, it may change certain conclusions.

Calculation of Estimated Estate Shortfall; and Exhibit O, Examiner's Solvency Analysis);

(ii)     the Estate has significant unencumbered funds from which to litigate Estate Claims if a consensual resolution cannot be reached and a trustee (or other party with STN authority) were to pursue such claims, and thus, there is a strong incentive to resolve matters consensually and minimize the ultimate Estate Shortfall by limiting the Estate's administrative expenses;

(iii)    the Estate Claims against Mr. Fareri for any distributions that Kensington made to him during the three-year period preceding the Petition Date net of contributions made during the same period have a <u>very high likelihood of success</u> in litigation[69] (<u>see</u> Sections IV(C)(i) and (v) *supra*);

(iv)     the Estate Claims against Mr. Fareri for any distributions that Kensington made to him during the three-year period preceding the Petition Date for which he asserts a dollar-for-dollar offset based upon contributions that he made back to Kensington during the same period have a <u>reasonable likelihood of success</u> in litigation[70] (<u>see</u> Section IV(C)(iv) *supra*);

(v)      there is a live, unresolved legal question regarding whether a trustee can recover wrongful distributions made to the members of a debtor limited liability company more than three years prior to the petition date which, if resolved in the favor of a

---

[69] The total amount of these potential Estate Claims is between $249,550 according to Kensington and $2,817,126.57 as identified by the Examiner.  An exploration of the differing amounts and reasons therefore is explored in detail in <u>Exhibit R</u> to this Report, which was prepared in response to Kensington's issues with the Draft Report.

[70] The total amount of these Estate Claims is between $5,690,372.30 as identified by the Examiner and $6,483,405.68 according to Kensington.  An exploration of the differing amounts and reasons therefore is explored in detail in <u>Exhibit R</u> to this Report, which was prepared in response to Kensington's issues with the Draft Report.

trustee for the Estate, would increase the amount of distributions that can potentially be recovered by over $12 million (see Section IV(C)(i) *supra*);

(vi)    while the Examiner is unable to make a definitive conclusion on the issue, he does not believe that the trustee will be successful in pursuing a claim to avoid and recover the value of the BTCs received by Mr. Fareri (Gating Issue #3 discussed in Section IV(C)(iii) *supra*);

(vii)    other Estate Claims against Mr. Fareri and/or entities under his control which, if successfully prosecuted, would also result in a complete satisfaction of the Estate Shortfall, have a sufficient likelihood of success in litigation to warrant serious consideration (*i.e.*, these Estate Claims have defenses, but certainly have "settlement value") (see Section IV(E) *supra*);

(viii)    any Estate Claims against Mr. Carnicelli have a relatively low likelihood of success in litigation (see Section IV(C)(v)(b) *supra*); and

(ix)    all of the Insider Claims except for the Development Claim subject to a $104,630.38 reduction, and $104,630.38 of Mr. Carnicelli's claim, should be expunged, waived or recharacterized to equity (see Section V(C) *supra*).

*[Signatures on next page]*

Dated: New York, New York
January 25, 2022

Respectfully submitted,

/s/ Fred Stevens
Fred Stevens, Examiner

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By: /s/ Sean C. Southard
Sean C. Southard
Fred Stevens
Kathleen M. Aiello
200 West 41st Street, 17th Floor
New York, New York 10036-7203
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: ssouthard@klestadt.com
fstevens@klestadt.com
kaiello@klestadt.com

*Counsel to the Examiner*